UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AROGANT HOLLYWOOD, et al., | Case No. 2:18-cv-02098-JGB (GJS) |
| Plaintiffs | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| CARROWS CALIFORNIA FAMILY RESTAURANTS, et al. | |
| Defendants. | |
| AROGANT HOLLYWOOD, | Case No. 2:18-cv-05607-JGB (GJS) |
| Plaintiff | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| CITY OF SOUTH PASADENA, et al., | |
| Defendants. | |
| AROGANT HOLLYWOOD, et al., | Case No. 5:18-cv-01664-JGB (GJS) |
| Plaintiffs | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| 2200 ONTARIO LLC, et al., | |
| Defendants. | |

AROGANT HOLLYWOOD, et al.,

Plaintiffs

v.

PUBLIC STORAGE, INC., et al.,

Defendants.

Case No. 5:18-cv-01822-JGB (GJS)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This Report and Recommendation is submitted to United States District Judge Jesus G. Bernal, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California.

**INTRODUCTION**

The four above-captioned lawsuits presently are stayed, pursuant to an Order issued by District Judge Bernal in each case on November 7, 2018 (the "Stay Order"). This Report and Recommendation is issued as a permitted exception to the Stay Order, and Objections and related Responses by the parties – if filed timely and consistently with the concurrent Notice as well as 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2) – are authorized without constituting a violation of the Stay Order.

There are a number of motions pending in these actions. This Report and Recommendation deals solely with pending motions to declare Plaintiffs to be vexatious litigants, which while filed originally in two of the actions, now have been joined in by the Defendants in all four cases. For the reasons discussed below, the Court recommends that the motions be granted, that Plaintiffs be declared to be vexatious litigants, and that the pre-filing orders specified *infra* issue.[1]

---

[1] The position of the nonmoving Defendants is the same essentially as that of the moving Defendants with respect to Plaintiffs' status as vexatious litigants. Accordingly, and due to the joinders filed by the nonmoving Defendants, the Court's findings of vexatiousness, and related recommendations, apply to the parties in all four cases. *Cf. Bonny v. Society of Lloyd's*, 3 F.3d 156, 171 (7th Cir. 1993) ("A court may grant a motion to dismiss even as to nonmoving defendants where the nonmoving defendants are in a position similar to that of moving defendants

2

1

# PROCEDURAL BACKGROUND

Plaintiffs have a substantial litigation history both in this Court and in the state courts. Below, the Court describes some of that history, as it bears on the pending motions at issue.[2]

## A.   State Courts

Set forth below are brief descriptions of the 25 Los Angeles County Superior Court ("LASC") actions filed by Plaintiffs Arogant Hollywood ("Hollywood") and Alison Helen Fairchild ("Fairchild") between May 2015, and January 2016, which ultimately led to the LASC declaring Hollywood and Fairchild to be vexatious litigants, as discussed *infra*.

_____

or where the claims against all defendants are integrally related.").

[2]     The first vexatious litigant motion was filed on April 25, 2018, in Case No. 2:18-cv-02098-JGB (GSJ) [Dkt. 7, "VL Motion 1"]. The second vexatious litigant motion was filed on September 21, 2018, in Case No. 5:18-cv-01664-JGB (GJS) [Dkt. 13, "VL Motion 2"]. As discussed *infra*, for purposes of both VL Motions 1 and 2, Defendants have filed a Joint Supplemental Brief and a Compendium of Evidence in Support in Case No. 5:18-cv-01664-JGB (GJS) [Dkt. 31, "Compendium" or "Comp. Ex."]. As a part of the Compendium [Comp. Ex. 1], Defendants have requested that the Court take judicial notice of the documents appended to the Compendium as Exhibits 10-63, which consist of copies of complaints and pleadings filed in various state and federal court actions.

Under Federal Rule of Evidence 201, the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Here, the court records submitted by the Defendants are relevant to the issues raised by VL Motions 1 and 2. A court may take judicial notice of its own files and of documents filed in other courts, and "may take judicial notice of proceedings in other courts both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007); *see also, e.g., MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986). As the exhibits in question are properly the subject of judicial notice, are relevant, and have been authenticated adequately, the Court GRANTS the Defendants' request for judicial notice. In addition, pursuant to Rule 201(b), the Court independently has taken judicial notice of the docket information available electronically for both the Los Angeles County Superior Court and for the federal courts through the PACER system.

1.     *Hollywood and Fairchild v. Wan Lin Hui Chauan and Golden Enterprises, Inc.*, LASC No. BC581193.  This case was brought on May 6, 2015, against a motel, arising out of Plaintiffs' stay, certain altercations, and the defendants' efforts to get Plaintiffs to vacate the premises.  On August 5, 2016, the LASC dismissed the case for failure to effect service of process.  [Comp. Ex. 10.]

2.     *Hollywood and Fairchild v. Wan Lin Hui Chauan and Golden Enterprises, Inc.*, LASC No. BC582429.  This case was filed on May 20, 2015, against the same defendants as LASC action No. 1 above, arising out of altercations that took place after the first action was filed.  After a demurrer was sustained and Plaintiffs failed to file an amended complaint, the LASC dismissed the case on June 29, 2016. [Comp. Ex. 11.]

3.     *Hollywood and Fairchild v. Michael W. Ludecke, et al.*, LASC No. BC594846.  This case was filed after Plaintiffs were evicted and their property sold at public auction pursuant to an unlawful detainer action.  After granting defendants' anti-SLAPP motion, the LASC struck the complaint and dismissed the action. [Comp. Ex. 12.]  Plaintiffs appealed (No. B271354), and their appeal was dismissed on August 9, 2016, after they failed to comply with notices sent regarding procedural defects in their appeal.

4.     *Hollywood and Fairchild v. Russell Lee Sung*, LASC No. BC596752.  This case arose out of the same events as LASC action No. 3 above and was consolidated with it and LASC action No. 8 below.[3]  After granting defendants' anti-SLAPP motion, the LASC struck the complaint and dismissed the action.  [Comp. Ex. 13.] As with LASC action No. 3, Plaintiffs' appeal was dismissed.

---

[3]     In No. 3, Plaintiffs sued the property owners.  In No. 4, Plaintiffs sued the property manager.  In No. 8, Plaintiffs sued the attorney for the property owners.

5.      *Hollywood and Fairchild v. K.V. Mart Company*, LASC No. BC599941.  This was the first of several lawsuits filed by Plaintiffs arising out of a June 2015 altercation between Hollywood and employees of a Valu Mart store.  The LASC sustained the defense demurrer without leave to amend and dismissed the case with prejudice on March 28, 2016.  [Comp. Ex. 14.]  Plaintiffs appealed the March 28, 2016 Order (No. B275560), but the California Court of Appeal dismissed their appeal on August 9, 2016, because Plaintiffs failed to comply with various procedural requirements.

6.      *Hollywood and Fairchild v. Laura Flores*, LASC No. BC601166.  This lawsuit was filed 13 days after LASC action No. 5 above and arises out of the same June 2015 altercation between Hollywood and employees of a Valu Mart store.  The LASC dismissed the case on May 18, 2016, after Plaintiffs failed to appear at a hearing and to file a proof of service of process.  [Comp. Ex. 15.]

7.      *Hollywood and Fairchild v. Anne Floane*, LASC No. BC601168.  This lawsuit was filed on November 16, 2015, and stems from a June 23, 2015 altercation at a Starbucks – the same incident that underlies LASC action No. 13 below.  The LASC dismissed the case on May 20, 2016, after Plaintiffs failed to appear at a hearing on an order to show cause.  [Comp. Ex. 16.]

8.      *Hollywood and Fairchild v. Stephen E. Ensberg*, LASC No. BC602762.  This lawsuit was filed on December 1, 2015, and thereafter was consolidated with LASC actions Nos. 3 and 4 above.  As in the two related cases, after granting defendants' anti-SLAPP motion, the LASC struck the complaint and dismissed the action on March 4, 2016.  [Comp. Ex. 17.]  As with LASC action No. 3, Plaintiffs' appeal was dismissed.

9.   *Hollywood and Fairchild v. McDonald's Corporation*, LASC No. BC602983. This lawsuit was filed on December 7, 2015.  Although the complaint was signed by Plaintiffs on December 6, 2015, their claims are alleged to stem from a "December 7, 2015" incident.  On June 9, 2016, the LASC granted the defense motion for terminating sanctions and dismissed the case with prejudice.  [Comp. Ex. 18.]

10.   *Hollywood and Fairchild v. Ross Stores Inc.*, LASC No. BC604140.  This lawsuit was filed on December 14, 2015, and stemmed from various incidents alleged to have taken place at a Pasadena Ross location from June through December 2015.  After a defense demurrer was sustained and Plaintiffs failed to file an amended complaint, the LASC dismissed the case and awarded defense costs on April 22, 2016.  [Comp. Ex. 19.]

11.   *Hollywood and Fairchild v. Gerald Wang and Hi-Way Host Motel LP*, LASC No. BC591990.  This lawsuit was filed on August 19, 2015, and stemmed from events alleged to have occurred during Plaintiffs' stay at a motel between March and November 2013.  The case was dismissed at Plaintiffs' request on August 29, 2016.  [Comp. Ex. 20.]

12.   *Hollywood and Fairchild v. Brett Daniel Barnard, et al.*, LASC No. BC598349.  This lawsuit was filed on October 19, 2015, against a self-storage facility.  The case was dismissed at Plaintiffs' request on March 1, 2016, after the defense filed a demurrer, motion to strike, and motion to compel.  [Comp. Ex. 21.]

13.   *Hollywood and Fairchild v. Starbucks*, LASC No. BC599942.  This lawsuit was filed on November 3, 2015, and stems from the same June 23, 2015 altercation at a Starbucks as was involved in LASC action No. 7 above.  After Starbucks filed a demurrer and motion to strike, Plaintiffs filed a request for dismissal on March 3,

6

2016.  The judgment of dismissal entered on April 7, 2016, and awarded Starbucks $495 against Plaintiffs.  [Comp. Ex. 22.]

14.    *Hollywood and Fairchild v. Airbnb, Inc.*, LASC No. BC601165.  This lawsuit was filed on November 16, 2015, and is one of several lawsuits filed by Plaintiffs involving events that occurred in connection with their March 2015 rental of an Airbnb unit.  The case was consolidated with two others (*see infra*) and ordered into arbitration on or about April 20, 2016, and Plaintiffs filed a request for dismissal on June 21, 2016.  [Comp. Ex. 23.]  Plaintiffs thereafter appealed the arbitration order (No. B275827), and after they failed to respond to the California Court of Appeal's Order directing them to show that the appeal had merit, the appeal was dismissed on August 12, 2016.  In January 2017, Plaintiffs moved to recall the remittitur and reinstate the appeal, and on February 2, 2017, the California Court of Appeal denied the motion, finding no good cause.

15.    *Hollywood and Fairchild v. Vicki Yang and Ben Yang*, LASC No. BC601167.  This lawsuit also was filed on November 16, 2015, and also stems from an Airbnb rental, although a different unit/incident than was involved in LASC action No. 14 above.  This case was ordered consolidated with LASC action No. 14 above.  [Comp. Ex. 24.]

16.    *Hollywood and Fairchild v. Brett Daniel Barnard*, LASC No. BC602189.  This lawsuit was filed on November 24, 2015, and appears to be duplicative in many respects of then pending LASC action No. 12 described above.  Plaintiffs filed a dismissal request on March 1, 2016, after the defendant filed an anti-SLAPP motion.  [Comp. Ex. 25.]

17.    *Hollywood and Fairchild v. Michael Doswell*, LASC No. BC602190.  This

lawsuit was filed on November 24, 2015, and is one of several Plaintiffs filed related to actions alleged to have been taken by or on behalf of the South Pasadena Public Library.  This case stemmed from a call by a custodian (the defendant in this case) to local police after Plaintiffs were trespassing on Library property and the custodian's related provision of a declaration when the Library sought a restraining order against Hollywood.  After the LASC issued an OSC due to Plaintiffs' failure to file proof of service of process, Plaintiffs filed a dismissal request on June 20, 2016.  [Comp. Ex. 26.]

18.   *Hollywood and Fairchild v. John Doe*, LASC No. BC602763.  This lawsuit was filed on December 1, 2015, and stems from allegations that:  Hollywood was sleeping on the street and became angry about loud music coming from a nearby car that was parked while the owner (the defendant) utilized a nearby ATM; Hollywood took the keys from the car's ignition and threw them over a nearby home's rooftop; and the car's owner, who now lacked his keys, contacted the police, who arrested Hollywood for theft.  The case was dismissed on March 3, 2016, at Plaintiffs' request.  [Comp. Ex. 27.]

19.   *Hollywood and Fairchild v. Del Taco Restaurants, Inc., et al.*, LASC No. BC602764.  This lawsuit was filed on December 1, 2015.  Defendants filed a demurrer and anti-SLAPP motion, and in response, Plaintiffs filed a request to dismiss on March 3, 2016.  [Comp. Ex. 28.]  The LASC thereafter issued orders in favor of the defense (including, apparently, an award of $5,885 in attorney's fees) and Hollywood appealed (No. B276777), but the California Court of Appeal dismissed his appeal for failure to designate the record.

20.   *Hollywood and Fairchild v. Starbucks Corporation*, LASC No. BC603671.  This lawsuit was filed on December 9, 2015.  After Defendant moved for sanctions

and the LASC issued a related OSC, Plaintiffs filed a request for dismissal, and the case was dismissed on November 28, 2016, with an award of $815 in costs to defendant Starbucks.  [Comp. Ex. 29.]

21.     *Hollywood and Fairchild v. Cecilia Shutan*, LASC No. BC605023.  This lawsuit was filed on December 21, 2015, and like LASC consolidated action No. 14 above, arises out of the same March 2015 rental by Plaintiffs of an Airbnb unit and later was dismissed by Plaintiffs after it was ordered into arbitration.  [Comp. Ex. 30.]

22.     *Hollywood and Fairchild v. Performance Team Freight Systems*, LASC No. BC605024.  This lawsuit was filed on December 21, 2015, and stems from the same incidents alleged in connection with LASC action No. 10 above.  After defendant filed a demurrer, Plaintiffs requested that the case be dismissed on March 4, 2016. [Comp. Ex. 31.]

23.     *Hollywood and Fairchild v. Marsden Building Maintenance LLC*, LASC No. BC605025.  This lawsuit was filed on December 21, 2015, and also arises out of the actions taken by a South Pasadena Public Library custodian (the defendant here is his employer).  After the LASC issued an OSC due to Plaintiffs' failure to file proof of service of process, Plaintiffs filed a dismissal request on June 20, 2016.  [Comp. Ex. 32.]

24.     *Hollywood and Fairchild v. George Patel, Aqua Inn Motel,* LASC No. BC606737.  This lawsuit was filed on January 12, 2016, and arises out of events alleged to have occurred in December 2015 and January 2016, during Plaintiffs' stay at a motel.  Defendants filed a motion for an order determining Plaintiffs to be vexatious litigants and requiring them to post a bond, and Plaintiffs filed a dismissal

request on June 22, 2016.  [Comp. Ex. 33.]

25.    *Hollywood and Fairchild v. The Vons Companies, Inc.,* LASC No. BC607945.  This lawsuit was filed on January 22, 2016, and arises out of events alleged to have occurred at various Von's markets between December 2013 and November 2015.  Defendants filed a demurrer and, as discussed below, by April 2016, Plaintiffs had been declared vexatious litigants.  Plaintiffs filed a dismissal request on June 17, 2016.  [Comp. Ex. 34.]

*The LASC Vexatious Litigants Order*

On February 8, 2016, in LASC action no. 24 above, LASC Judge Kevin C. Brazile issued an Order To Show Cause, which was set for an April 7, 2016 hearing and directed Plaintiffs to show cause why they should not be declared vexatious litigants and subject to a pre-filing order.[4]  Judge Brazile noted that, in barely 10 months' time, Plaintiffs had filed 24 actions, "often improperly bringing several concurrent lawsuits based on the same alleged violation of a primary right" and often had failed to file the required Notice of Related Case, "leading to the potential for duplication of judicial resources and inconsistent results in litigation, and suggesting an appearance of forum-shopping on their claims."  Judge Brazile noted that Plaintiffs might be vexatious litigants "based on the frivolous and delaying litigation procedures and tactics they employ."

In addition, Judge Brazile found that Plaintiffs might be vexatious litigants "based on the substantive lack of merit in the pleadings they file."  As an example, Judge Brazile recounted the allegations of the complaint filed in LASC action No. 18 above, in which Hollywood admittedly yelled at the defendant, took his car keys, and threw them over a building's rooftop, and yet Plaintiffs were suing the

---

[4]    A copy of this February 8, 2016 Order To Show Cause can be found in Case No. 2:16-cv-06457-JGB (GJS), at Docket 7-1, ECF ##252-264.

defendant for false arrest, intentional infliction of emotional distress, etc., because the defendant had called the police as a result of Hollywood's theft of his car keys. Judge Brazile concluded that the complaint allegations "lack merit because Mr. Hollywood admits in the pleading his own wrongdoing that justified and caused [the defendant] to call the police, leading to the subsequent arrest." Judge Brazile cited as another example LASC action No. 19 above, quoting the complaint allegations showing that Hollywood admittedly made threatening statements to numerous Del Taco employees, who eventually called the police. Judge Brazile found the tort claims alleged to lack merit on the face of the complaint, given Hollywood's admission therein of how it was his "own wrongdoing that justified and caused the employees to call the police." As Judge Brazile concluded:

> Indeed, most of the complaints lodged by these litigants follow a familiar pattern: Mr. Hollywood creates or escalates a situation – often citing to Ms. Fairchild's health or use of a wheelchair and/or their being homeless as a basis for demanding extraordinary consideration or exemption from the law; oftentimes Mr. Hollywood then actually threatens a lawsuit (sometimes accompanied by his turning on his video-equipped glasses or showing complaints filed against others); the police are usually called and Mr. Hollywood is often detained or arrested; and then the plaintiffs sue, alleging a variety of statutory violations and tort causes of action to recover for the injustices they argue that they suffered. Due to consistent factual patterns and accelerated pace of the lawsuits filed, it appears that the plaintiffs are suing people as a way of life. Because the court liberally grants their fee waiver requests, their actions have placed a significant financial burden on the courts.

On April 7, 2016, the LASC held a consolidated hearing in Plaintiffs' various cases with respect to the Order To Show Cause. The LASC issued a tentative ruling indicating it was inclined to find Plaintiffs to be vexatious litigants.[5] Neither

---

[5]    A copy of that tentative ruling can be found at Docket No. 7-2, at ECF ##265-268, in Case No. 2:16-cv-06459-JGB (GJS).

Hollywood nor Fairchild appeared at the April 7, 2016 hearing, nor did they file any response to the February 8, 2016 Order To Show Cause.  Judge Brazile thereafter issued an April 7, 2016 Order designating Plaintiffs as vexatious litigants and imposing a pre-filing order.  [Comp. Ex. 34, the "LASC Vexatious Litigants Order."]

In the LASC Vexatious Litigants Order, Judge Brazile opined that, as outlined in the earlier Order To Show Cause, "pursuing unmeritorious or frivolous litigation tactics validly describes the conduct of Mr. Hollywood and Ms. Fairchild."  He listed the 25 actions filed by Plaintiffs and concluded that at least ten of them had been determined adversely to each of them, noting that under California law,[6] an action voluntarily dismissed by a plaintiff is considered to be a case "finally determined adversely" to the plaintiff under California's vexatious litigant statute, because such a case is "nevertheless a burden on the target of the litigation and the judicial system."  Judge Brazile reiterated his prior findings that Plaintiffs "have repeatedly filed unmeritorious pleadings and engaged in tactics that are frivolous or solely intended to cause unnecessary delay" and "appear improperly to be suing people as a way of life," and found further that, "with their recent wave of voluntary dismissals of cases, they have shown a pattern of filing lawsuits and then dismissing them, usually after a defendant files a demurrer or anti-SLAPP motion."   Judge Brazile determined that Plaintiffs are vexatious litigants within the meaning of California Code of Civil Procedure § 391(b)(1)&(3).

Plaintiffs appealed the LASC Vexatious Litigants Order (No. B275803).  On August 12, 2016, the California Court of Appeal dismissed the appeal after Plaintiffs failed to respond to the state appellate court's June 28, 2016 Order requiring them to show that the litigation had merit.

On November 21, 2018, in LASC action no. 24, Plaintiffs filed a motion to

---

[6]   *Tokerud v. Capitolbank Sacramento*, 38 Cal. App. 4th 775, 779 (1995).

vacate the LASC Vexatious Litigants Order and remove their names from the Judicial Council's Vexatious Litigants List, which was denied on January 3, 2019. [*See* Docket No. 38, Ex. A in Case No. 2:18-cv-05607-JGB (GJS).]  Plaintiffs appealed the January 3, 2019 Order (No. B296229), and on March 13, 2019, the California Court of Appeal ordered them to show that the litigation has merit.  In addition, on April 4, 2019, a notice of default was sent with respect to the appeal, due to various procedural failings by Plaintiffs.  [*See* Docket 41-1, Ex. A in Case No. 2:18-cv-05607-JGB (GJS).]  Plaintiffs moved for reconsideration of the January 3, 2019 Order, but on April 4, 2019, that motion was taken off calendar due to the pending appeal.  [*Id.*, Ex. B.]  On July 18, 2019, after Plaintiffs failed to respond to the March 13, 2019 notices sent to them to show that the litigation had merit, the California Court of Appeal denied Plaintiffs permission to proceed with the appeal and dismissed it.  [*See* Docket No. 44, Ex. A in Case No. 2:18-cv-05607-JGB (GJS).]  On August 9, 2019, the California Court of Appeal denied Hollywood's motion to vacate the dismissal.[7]

Lest there be any confusion regarding the reason for the foregoing discussion of state court events, the Court wishes to make clear that the fact that Plaintiffs have been found to be vexatious litigants in the state courts – in itself – is not a reason to find them to be vexatious litigants in this District.  Plaintiffs' state court proceedings, however, are relevant here, because they demonstrate a pattern of vexatious behavior that has continued in federal court and which, the Court believes, will continue unless Plaintiffs are declared vexatious litigants in this District and unless an appropriate pre-filing order is imposed.  *See Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1065-66 (9th Cir. 2014) (noting that in considering

---

[7]      Following the LASC Judge's April 4, 2019 Order taking Plaintiffs' reconsideration motion off calendar due to the pending appeal, Plaintiffs filed applications in the California Court of Appeal seeking leave to proceed with a mandamus petition (No. B297055).  On July 10, 2019, the California Court of Appeal denied the applications.

whether the declare a plaintiff to be vexatious, the district court is "entitled" to consider the litigant's "pattern of state court litigation," because vexatious litigation designations are made "out of concern for the affected parties, as well as out of concern for the courts themselves.  And a pattern of frivolous or abusive litigation in different jurisdictions undeterred by adverse judgments may inform a court's decision that a [pre-filing order] is necessary.").

## B.   Federal Court

As set forth below, Plaintiffs have continued their pattern of behavior aptly described in, and which led to, the issuance of, the LASC Vexatious Litigants Order. With only a few exceptions, this Court has been assigned to the cases Plaintiffs have filed in this District and it has reviewed the filings in any to which it was not assigned.  As a result, the Court is quite familiar with the allegations of the federal complaints Plaintiffs have filed and, without exception, they follow the patterns described by Judge Brazile – *to wit*, Plaintiffs are somewhere (such as a coffee house or restaurant or self-storage building or store or public street or motel or other rental lodging) and Hollywood's behavior and threats results in an antagonistic situation – which he just happens to record with his GoPro or other device – and which in turn typically leads to police being summoned and Hollywood being detained and sometimes arrested.  At times, these encounters stem from Hollywood taking offense (purportedly on Fairchild's behalf) at something that has occurred, and at other times, they stem from Hollywood taking personal offense at something innocuous or among the routine incidents of life.  The common theme, however, is that something happens that Hollywood does not like, or someone behaves in a manner he dislikes, and he reacts with outrage, anger, insults, and threats, including threats to sue.

The twist in Plaintiffs' federal filings is that they now have added allegations of racial and disability discrimination to the same and/or same types of allegations they

14

made in the state courts – in many instances, to the same claims and actions they filed in the LASC – in an ill-disguised effort to manufacture federal jurisdiction over their previously-made state claims.  In addition, once they moved their "way of life" (as Judge Brazile put it) to federal court, Plaintiffs began filing bloated and prolix complaints, often well in excess of 100 or 200 pages, filled with argument, vituperation, disparagement, diatribes, and other inappropriate matter that grossly violated Rule 8 of the Federal Rules of Civil Procedure – pleadings which appear to mirror much of the behavior on Hollywood's part that has led to the events over which he and Fairchild sue.

### 1.    Prior Federal Actions

After the LASC Vexatious Litigants Order issued and Plaintiffs no longer had unfettered access to sue in the Los Angeles Superior Court, Plaintiffs began filing lawsuits in this District.  On August 25, 2016, Hollywood filed his first case here – Case No. 2:16-cv-06392-JGB (GJS) – and on the next day,  both Hollywood and Fairchild filed a related action – Case No. 2:16-cv-06459-JGB (GJS).  There is no apparent reason why Plaintiffs chose to split their related claims into two separate cases.  These lawsuits stemmed from:  incidents that occurred after a long-term tenant of a home invited Hollywood to stay there, to help him get back on his feet, and without the tenant's permission, Hollywood moved Fairchild into the home and then managed to drive the tenant out by his abusive behavior; altercations Hollywood instigated with a neighboring tenant, which included admitted threats and abusive language, recorded by him; and related eviction proceedings.  Plaintiffs were denied leave to proceed on an *in forma pauperis* basis ("IFP") in both cases based on, *inter alia*, the failure to state a claim upon which relief can be granted, and they did not appeal.

Approximately five months passed before Plaintiffs returned to this District, filing two nearly identical cases against different motels within the first two weeks

of February 2017 – Case Nos. 2:17-cv-00864-RGK (AGRx), and 2:17-cv-01143-JAK (RAOx).  In the 17-864 action, the District Judge denied Plaintiffs' IFP applications on February 6, 2017, ordering Plaintiffs to pay the filing fee if they wished to continued, and eventually dismissed the case on March 10, 2017, when they did not.  However, while the 17-864 action still remained pending, Plaintiffs simply re-filed their same complaint and IFP applications as a new action – Case No. 2:17-cv-01195-RGK (ASx).  That subsequent 17-1195 case was dismissed on March 3, 2017, with a finding that it was an "improper re-filing of a previously-filed case with the intent to circumvent a lawful court order" [Dkt. 10] – the same type of conduct that Judge Brazile had found supported finding Plaintiffs to be vexatious litigants.   Plaintiffs did not appeal the dismissals of the 17-864 and 17-1195 actions.  In the 17-1143 action, Plaintiffs' IFP applications were denied and the case was dismissed.  Plaintiffs appealed (No. 17-55874), and the United States Court of Appeals for the Ninth Circuit denied leave to proceed on an IFP basis on March 26, 2018, finding that the appeal was frivolous.

Following the February 2017 filing of the above three cases, Plaintiffs filed another lawsuit in this District on March 22, 2017, in Case No. 2:17-cv-02253-JGB (GJS).[8]  This lawsuit stemmed from an Airbnb rental and behavior by Hollywood that resulted in the property owner calling the police and stating that she was afraid, because Hollywood had threatened her.  Plaintiffs sued the property owner and various executives of Airbnb.  Seven days later, Plaintiffs filed Case No. 2:17-cv-02449-JGB (GJS), which stemmed from the *same* Airbnb situation that was involved in the 17-2253 lawsuit, except in this second case, Plaintiffs sued the City of Los Angeles and police officers based on their response to the property owner's call.  Once again, there was no apparent reason why Plaintiffs chose to split the case in two and have two plainly related cases pending at the same time.  As Judge

---

[8]    This lawsuit stems from the same March 2015 Airbnb incident as LASC actions Nos. 14 and 21 above.

Brazile had found improper in the LASC cases, Plaintiffs continued their pattern of bringing concurrent lawsuits based on the same incidents, yet failing to file related case notices, in violation of Local Rule 83-1.3.1.

On the same day that Plaintiffs filed the second AirBnb case, they filed two additional lawsuits in this District in Case Nos. 2:17-cv-02450-JGB (GJS), and 2:17-cv-02451-JGB (GJS).  The 17-2450 and 17-2451 cases were brought as two separate cases but stemmed from the same alleged incident:  Hollywood and Fairchild were sleeping on a public sidewalk; Hollywood became angry when workers for a private company made noise across the street; Hollywood threatened to cut the tires on a work vehicle and then removed the air caps from the vehicle's rear tires; and police arrived and arrested Hollywood for making criminal threats, charges that ultimately were dismissed.  As with the above two Airbnb cases, for no apparent reason, Plaintiffs again opted to split the lawsuit in two, suing the private defendants in one and the police-related defendants in a separate case, while at the same time violating the Local Rule requirement that they file a Notice of Related Case.

In all four of cases filed in March 2017 described above, Plaintiffs' IFP applications were denied and the cases were dismissed, with findings that Plaintiffs had made materially inconsistent sworn statements as to their finances and of, *inter alia*, untimeliness and the failure to state a claim upon which relief can be granted. Plaintiffs appealed in all four cases:  in the 17-2253, 17-2449, 17-2450 cases, the Ninth Circuit denied leave to proceed on appeal on an IFP basis and dismissed the appeals as frivolous on March 26, 2018 (Nos. 17-55867, 17-55869, No. 17-55870, respectively); and in the 17-2451 case, the Ninth Circuit granted leave to proceed on an IFP basis but thereafter dismissed the appeal on March 19, 2018, for failure to prosecute (No. 17-55873).

By now, Plaintiffs had filed nine cases in this District in a seven-month period, albeit without success.  The next month after filing the above-noted four

March 2017 cases, Plaintiffs filed Case No. 2:17-cv-03008-JGB (GJS) on April 20, 2017, against, among others, Buy-Low Markets.  This case stemmed from an April 2015 incident at a Valu Mart store in Temple City, in which police were called by store personnel and they briefly detained Hollywood.  On May 4, 2017, Plaintiffs' IFP applications were denied and the case was dismissed, with findings that Plaintiffs had continued to make inconsistent sworn statements as to their finances and that the complaint failed to state a claim upon which relief could be granted.  Plaintiffs appealed and on March 27, 2018, the Ninth Circuit denied leave to proceed on an IFP basis and dismissed the appeal as frivolous (No. 17-56285).

While the appeal of the dismissal of the above 17-3008 case was pending, Plaintiffs again sued Buy-Low Markets, with a complaint filed on July 7, 2017, in Case No. 2:17-cv-05004-JGB (GJS).[9]  This case again stemmed from an incident at the Temple City Valu Mart store, albeit a different incident than that involved in the 17-3008 case.  In the 17-5004 complaint, Plaintiffs alleged that they were waiting for a friend to help them move their property (which was located at a site across the street from the store) and admitted that, even though Hollywood earlier had been banned from the store, Hollywood and Fairchild opted to stand outside the store rather than on the side of the street where their property was located.  Perhaps not surprisingly, Valu-Mart employees took exception to Hollywood standing outside the store and, in by now typical fashion, words were exchanged between Hollywood and Valu Mart employees, police were called, Hollywood refused to leave even after the police told him to do so, and Hollywood was cuffed and detained.  Plaintiffs' IFP applications again were denied and the case was dismissed, with findings that Plaintiffs had continued to make inconsistent sworn statements as to their finances and of the failure to state a claim upon which relief could be granted.  Plaintiffs appealed and on October 25, 2017, the Ninth Circuit dismissed the appeal for failure

---

[9]     This action stemmed from the same June 2015 incident as LASC actions Nos. 5 and 6 above, which were dismissed with prejudice in March 2016.

to prosecute (No. 17-56284).

In the meantime, on May 10, 2017, Plaintiffs had brought another lawsuit against a motel in Case No. 2:17-cv-03519-ODW (AJWx).[10]  Plaintiffs' IFP applications were denied and the case thereafter dismissed.  Plaintiffs appealed, and on March 26, 2018, the Ninth Circuit denied leave to proceed on an IFP basis, with a finding that the appeal was frivolous (No. 17-55871).

On the same day that Plaintiffs filed the second lawsuit against Buy-Low Markets (July 7, 2017), they filed another action, this time against Starbucks in Case No. 2:17-cv-05005-JGB (GJS), based on an incident at a Starbucks location.[11]  In this case, the Complaint alleged that: Hollywood got into an altercation with, and threatened to sue, Starbucks employees after he moved store furniture to make room for Fairchild's wheelchair; police officers arrived and told Plaintiffs they could not make a disturbance; Hollywood then complained that another customer had moved chairs yet the Starbucks employees took no action; police officers again arrived and told Plaintiffs they had to leave; one of the defendants produced a document showing that Hollywood was banned from all Starbucks locations due to an incident at a different Starbucks location; Hollywood refused to leave; and after two of the defendants signed a private citizen's arrest form, police officers cuffed Hollywood and kept him in a cell for four hours.  On July 26, 2017, Plaintiffs' IFP applications were denied and the case was dismissed, with findings that Plaintiffs continued to make inconsistent sworn statements about their finances and of untimeliness and the failure to state a claim upon which relief can be granted.

On November 22, 2017, Plaintiffs filed a substantially similar lawsuit against Peets Corporation, in Case No. 17-cv-08535-JGB (GJS), again stemming from a

---

[10]    This lawsuit was a do-over of the LASC actions Nos. 1 and 2 described above.

[11]    This lawsuit stemmed from the same June 23, 2015 incident on which LASC actions Nos. 7 and 13 were based.

coffee house altercation in which Hollywood got into an argument with a Peet's employee and another customer about furniture placement, Hollywood threatened to sue, police officers arrived and told Hollywood to leave, he refused to do so, and following a private citizen's arrest form being signed, Hollywood was cuffed and detained in a cell.  Plaintiffs' IFP applications were denied and the case was dismissed, again with findings that Plaintiffs continued to make inconsistent sworn statements about their finances[12] and of untimeliness and the failure to state a claim upon which relief can be granted.

Plaintiffs appealed in both the above-noted cases filed against Starbucks and Peet's.  On March 27, 2018, the Ninth Circuit denied Plaintiffs' IFP applications and dismissed both appeals as frivolous (No. 17-56283, No. 18-55167, respectively).

On August 9, 2017, Plaintiffs filed another lawsuit in this District, stemming from events related to a restraining order that the South Pasadena Public Library obtained against Hollywood, in Case No. 2:17-cv-5919-JGB (GJS).[13]  Among other things, Hollywood claimed to have suffered emotional distress and lost employment opportunities due to, and brought various claims based on, the fact that the Library included in its minutes various matters of public record, including noting the restraining order obtained against Hollywood – who was described as "a homeless man that has vexed the Library for years" – and that Hollywood had been sentenced

---

[12]     The Court will not discuss the specifics of these inconsistent statements herein, because they have been described in *detail* in the numerous above-noted Orders denying Plaintiffs' IFP applications.  Suffice it to say, in these Orders, the Court outlined the ongoing material and troubling discrepancies in Plaintiffs' sworn statements about their finances, including the repeated, inexcusable failures by Fairchild to disclose the monthly benefits she received and Plaintiffs' contradictory and inconsistent sworn statements about their financial assets.  As the Court noted, once Plaintiffs started to receive adverse rulings on their IFP applications, they began changing their sworn averments as to their financial resources, as well as started omitting income sources.  Equally troubling was that Plaintiffs continued, over and over, to proffer materially inconsistent and ever-changing financial statements *even after* the Court – repeatedly – noted the issue and its concerns about Plaintiffs' veracity regarding their finances.

[13]     This lawsuit stems from the same events alleged in LASC actions Nos. 17 and 23 described above.

to 90 days in jail in connection with a different criminal case brought against him. Plaintiffs' IFP applications were denied and the case was dismissed, with findings that Plaintiff continued to make materially inconsistent sworn statements as to their financial statuses, untimeliness, and failure to state a claim upon which relief can be granted.  Plaintiffs appealed (No. 17-56498), and on March 27, 2018, the Ninth Circuit dismissed the appeal as frivolous and denied leave to proceed on an IFP basis.

In short, between August 2016, and November 2017, Plaintiffs filed a steady stream of actions (15 in total), sometimes filing three or four new cases per month. In each instance, their efforts failed and their cases were dismissed.  Plaintiffs then switched tactics and began paying the filings fees for their complaints, leading to six additional lawsuits filed between February 2018, and August 2018.

On February 28, 2018, Plaintiffs filed Case No. 2:18-cv-01642-JGB (GJS), brought against a storage company.  That lawsuit was voluntarily dismissed on April 19, 2018.  A month later, Plaintiffs filed the Carrows Action (described below), which is the subject of this Report and is pending.  On May 1, 2018, Plaintiffs filed another lawsuit against a motel, in Case No. 2:18-cv-03676-JGB (GJS).  That lawsuit was dismissed on July 16, 2018, pursuant to the parties' stipulation.  On June 25, 2018, Hollywood filed the South Pasadena Action (described below), which also is the subject of this Report and is pending.  On August 9, 2018, Plaintiffs filed the 2200 Ontario Action (described below), which too is involved here and is pending.  On August 27, 2018, Plaintiffs filed the Public Storage Action (described below), which similarly is the subject of this Report and pending.

Finally, on at least three occasions of which the Court is aware, Plaintiffs improperly have sought to remove state court unlawful detainer actions brought against them to federal court.  In Case No. 1:16-cv-07275-CM, filed in the United States District Court for the Southern District of New York on September 16, 2016, Hollywood purported to remove a Los Angeles Superior Court unlawful detainer

action filed against him.  In his Notice of Removal [Dkt. 2 at 2], Hollywood explicitly acknowledged that he was aware he had removed the action to the "wrong" district court.  On October 12, 2016, the assigned United States District Judge promptly remanded the action, noting that removal was improper, and denied leave to proceed on an IFP basis [Dkt. 7].

Shortly after the improper Southern District of New York removal, Hollywood filed a mandamus petition in the Ninth Circuit (Case No. 16-73215), seeking to force the state court to halt the unlawful detainer court proceeding against him based on Hollywood's above-noted removal of the action to an admittedly "wrong" federal court.  Two days later, on October 5, 2016, the Ninth Circuit denied Hollywood leave to proceed IFP and dismissed the petition for lack of jurisdiction.

On July 27, 2017, Plaintiffs removed a different Los Angeles Superior Court unlawful detainer action pending against them to this District, in Case No. 2:17-cv-05562-SJO (JEMx).  On August 1, 2017, Plaintiffs' IFP applications were denied and the unlawful detainer case was ordered remanded, with a finding that it had been removed improperly [Dkts. 6-8].

Despite having been advised repeatedly about the improper nature of his attempted removals of unlawful detainer actions to federal court, on September 6, 2018, in Case No. 5:18-cv-01902-JGB (GJS), undeterred, Hollywood removed to this District an unlawful detainer action brought against him in San Bernardino County Superior Court.  On September 14, 2018, Hollywood's IFP application was denied and the action was ordered remanded, with a finding that, once again, removal had been improper [Dkts. 8-9].

## 2.    The Instant Four Actions

The four presently pending cases were filed between March 13, 2018, and August 27, 2018.  These are:  *Arogant Hollywood, et al. v. Carrows California Family Restaurants, et al.*, Case No. 2:18-cv-02098-JGB (GJS) (the "Carrows

22

Action"); *Arogant Hollywood v. City of South Pasadena, et al.,* Case No. 2:18-cv-05607-JGB (GJS) (the "South Pasadena Action"); *Arogant Hollywood, et al. v. 2200 Ontario LLC, et al.,* Case No. 5:18-cv-01664-JGB (GJS) (the "2200 Ontario Action")' and *Arogant Hollywood, et al. v. Public Storage, Inc., et al.,* Case No. 5:18-cv-01822-JGB (GJS) (the "Public Storage Action").  Below is a summary of the salient events that have occurred in these four cases:

### a.    Carrows Action

Plaintiffs' behavior in the Carrows Action has reflected not only a remarkable level of aggression and incivility towards the defense attorneys but, also, a blatant disrespect for the Court and a refusal to abide by its Orders as well as the rules that govern all federal court litigants.

After the Carrows Action was filed and two Defendants (a corporate entity and one of its employees) filed VL Motion 1, Plaintiffs filed a motion seeking to have the individual Defendant defaulted.  [Dkt. 19.]  After Defendants filed a response explaining that the individual Defendant's delay was the result of a miscommunication between various parties [Dkt. 21], Plaintiffs withdrew their motion, but then immediately filed a separate request seeking the default of the corporate Defendant and then filed a second default request against the individual Defendant.  [Dkts. 24, 25, 28.]  The Court denied the default motions.  [Dkt. 36.]  Five days later, Plaintiffs filed an amended complaint adding two further individual Defendants.  Although the Court's Initial Order in this case explicitly cautioned Plaintiffs about the Rule 4(m) deadline and that dismissal could follow if service of process was not effected before its expiration [Dkt. 7, ¶ III], there is no evidence that these two additional Defendants have been served with process, and the Rule 4(m) period for serving them expired in August 2018.

In addition to VL Motion 1, the two served Defendants filed a motion to dismiss the amended complaint.  [Dkt. 38, "Carrows MTD 1."]  Plaintiffs did not

file an opposition to Carrows MTD 1 by their deadline for doing so, nor did they file a timely extension request.   Two weeks after that deadline had passed, the Court issued an Order vacating the hearing date for Carrows MTD 1, after noting that no Opposition had been filed.  [Dkt. 40.]  In response, rather than seek permission to file a belated Opposition, Plaintiffs filed an application to "continue" the already-vacated hearing date.  [Dkt. 41.]  The Court very liberally construed that application as a request to extend the time for opposition to Carrows MTD 1 and extended Plaintiffs' time to file their Opposition to July 30, 2018, noting that after the dates established by the Court's Order passed, Carrows MTD 1 would be under submission.  [Dkt. 43.]  In that Order, the Court explained to Plaintiffs the nature of Rule 12(b)(1) and (6) motion review and explicitly cautioned Plaintiffs that their stated intent to proffer a bevy of new evidence in opposition to Carrows MTD 1 was inappropriate in light of the actual review standard that governed the motion.

Plaintiffs ignored the Court's above Order and the advice therein regarding the materials that properly may be considered in connection with Carrows MTD 1. On July 30, 2018, they filed a 62-page memorandum in opposition to Carrows MTD 1, with 20 attached pages [Dkt. 50], without first seeking leave to exceed the Local Rule page limitation and which relied on matters outside the pleadings.  On August 2, 2018, the Court struck the noncomplying memorandum in an Order that explained in some detail why the memorandum was needlessly verbose and relied improperly on matters outside the complaint (despite the earlier advice that Plaintiffs should not do so), and gave Plaintiffs until August 13, 2018, in which to file a compliant memorandum.  [Dkt. 52.]  On September 10, 2018, a third Defendant filed a motion to dismiss the amended complaint.  [Dkt. 55, "Carrows MTD 2."]  Further briefing ensued and Carrows MTD 1 and Carrows MTD 2 are under submission; no further briefing is permitted.  [Dkt. 71.]

In the interim, Plaintiffs failed to file an opposition to VL Motion 1 by their May 9, 2018 deadline, nor did they seek an extension of time to do so.  The Court

thereafter took the hearing on that motion off calendar.  [Dkt. 31.]  On September 22, 2018, without first seeking leave, Plaintiffs filed a grossly untimely "motion to strike" VL Motion 1 [Dkt. 59], which in the interest of moving this case forward, the Court has deemed to be their Opposition to VL Motion 1.  Defendants filed a Reply on October 8, 2018 [Dkt. 64], and thus, as of that date, VL Motion 1 was under submission, with no further briefing permitted.  Nonetheless, and again without seeking leave to do so and in disregard of the Court's Order, Plaintiffs on October 23, 2018 filed another, unauthorized opposition to VL Motion 1.  [Dkt. 69.]  On October 24, 2018, the Court issued an Order noting the unauthorized nature of Plaintiffs' second untimely brief but nonetheless agreed to consider it and allowed Defendants to file a reply by November 13, 2018.  [Dkt. 70.]  As discussed below, the Carrows Action thereafter was ordered stayed on November 7, 2018.

The above behavior by Plaintiffs demonstrates that they apparently believe that they are not bound by court orders or federal or local rules and may do as they please.  As disturbing (if not contemptuous) as this behavior is, as motion proceedings ensued, the Court became aware of an even more troubling pattern of behavior by Plaintiffs, which demonstrated not just their disregard for the Court's Orders but a shocking disregard for civility and appropriate litigation behavior.

On July 19, 2018, due to Defendants' submission of a request for a pre-discovery motion telephonic conference in compliance with the Court's Procedures and Requirements, the Court became aware that Plaintiffs had improperly attempted to engage in multiple discovery efforts – conduct that plainly was prohibited by this Court's Initial Order of March 16, 2018 [Dkt. 6][14] – and that, once again, Plaintiffs

---

[14]     The Court's Initial Order had advised the parties expressly that:  good cause existed to delay the Fed. R. Civ. P. 16 scheduling conference until after all Defendants had answered the operative complaint; therefore, the Fed. R. Civ. P. 26(a) and (f) initial disclosure and conference requirements were not triggered; and, as a result, discovery was prohibited until an Order issued allowing it.

1    had violated one of the Court's Orders.  Given the clear language of the Court's

2    Order, Plaintiffs could not possibly have believed that they were allowed to

3    undertake discovery, and thus, their violation of the Order must be viewed as

4    intentional.  Based on the conference request and a subsequent filing by Defendants,

5    the Court further became aware Hollywood had been sending e-mails and making

6    telephone calls to defense counsel and their staff that were wholly inappropriate (to

7    put it charitably) and demonstrated Plaintiffs' intended misuse of the legal process.[15]

8        As an example, on April 28, 2018, Hollywood sent an e-mail to Norman Ben

9    Cramer, one of the attorneys representing the Defendants in the Carrows Action.  In

10   it, Hollywood stated, 'I ALREADY DO NOT LIKE YOU," called Cramer a

11   "moron" and a "fool," and told Defendants to file their answers "so we can begin

12   our WAR!"  [Dkt. 21-2 at ECF ##189-190.]  On various dates in May 2018, even

13   though defense counsel had told Hollywood they did not consent to him recording

14   their telephone conversations, he continued to do so.  [Dkt. 49, Exs. A, F; *see also*

15   Comp. Ex. 2, Declaration of Kristin W. Roscoe ("Roscoe Decl."), ¶ 8.]  On May 31,

16   2018, after then defense counsel Roscoe advised that the parties' required Rule 26(f)

17   conference had not yet occurred and she would be opposing a motion Plaintiffs

18   intended to file, Hollywood responded that Plaintiffs would be serving discovery

19   and called her a "stupid BUTT UGLY FOOL!"  [Dkt. 49, Ex. F.]  On June 23, 2018,

20   Hollywood sent an email to the defense attorneys and directly to various individuals

21   employed by the corporate Defendants threatening to sue them in federal court

22   under Section 1983.  [Dkt. 49, Ex. P.]  On July 6, 2018, Hollywood e-mailed Roscoe

23   and stated that he was filing a State Bar complaint against her and would be suing

24   her that month.  [Dkt. 49, Ex. U.]  On July 9, 2018, Hollywood e-mailed Roscoe and

25   stated that he would be suing her and her firm "for representing Carrows and lying

26   in your court papers," and would be filing separate lawsuits on July 25, 2018

27   _____

28   [15]    Copies of those e-mails are set forth in Carrows Action Dkt. 49, as well as a few set forth
     in Comp. Exs. 64-66.

1    "GUARANTEED!!!!" against her and various other attorneys at her firm and firm

2    partners.  [Ex. 49, Ex. X.]  Later that same day, Hollywood sent e-mails to Roscoe,

3    other attorneys at her firm, and ten or so persons employed at the corporate

4    Defendants, in which he stated, "My name is Arogant. The next time you call me

5    Mr. Hollywood I will call you butch or Ms. WELK" and "I told you bit** [sic] to

6    stop calling me Mr. Hollywood. My name is Arogant Ms. Welk," called her a

7    "[s]cumbag dumb attorney[]," and repeated his threat that he would be filing a State

8    Bar complaint against her and would be suing her and her firm.  [Dkt. 49, Ex. Z.]

9          Hollywood's threats against the Defendants' attorneys did not end.  On July

10   16, 2018, in connection with Plaintiffs' repeated efforts to pursue prohibited

11   discovery, Hollywood e-mailed Roscoe and told her that he would "appeal any

12   ruling against [m]e in the Ninth Circuit via writ of mandamus," would sue her in

13   federal court for "interfering with [his] constitutional rights to prosecute this case,"

14   and that another lawyer at her firm would be sued separately – a threat he repeated

15   in an e-mail two days later, advising Roscoe she was "about to get sued."  [Dkt. 49,

16   Exs. FF, HH, KK.]  On July 16, 2018, a separate e-mail was sent to Roscoe

17   allegedly from Fairchild,[16] threatening to sue Roscoe and her firm for filing a

18   motion to dismiss on Defendants' behalf and for refusing to comply with Plaintiffs'

19   demand that they engage in prohibited discovery.  [Comp. Ex. 64.]  On September

20   13, 2018, Hollywood sent an e-mail to Roscoe and numerous others, in which he

21   asserted that "**BY NOW [the Carrows] DEFENDANTS HAVE A LEGAL BILL**

22   **OF NEARLY $15,000 THANKS TO THEIR CORNY LAW FIRM FIGHTING**

23   **THIS LAWSUIT SINCE APRIL 2018.**  ALL DEFENDANTS AND FUTURE

24   DEFENDANTS BETTER PAY ATTENTION BECAUSE YOU WILL FACE A

25

26   ───────────────

27   [16]     As discussed *infra*, there is substantial reason to believe this e-mail was sent by Hollywood
     pretending to be Fairchild.  Indeed, in an e-mail sent on January 8, 2019, to defense counsel in

28   these four actions, Hollywood asserted that Fairchild "has sent no e-mails to any of you."  [Dkt. 31
     in South Pasadena Action.]

                                                27

1    SIMILAR FATE WITH ME!!!!!!!!!!!!!!!!"  [Dkt. 64, Ex. 3.]

2            At the same time that Hollywood was repeatedly issuing threats to sue

3    defense counsel for their efforts to defend their clients, he repeatedly made the

4    frivolous demand that they "transfer" the defense of the case to lawyers in a

5    different office, because he believed this would be more convenient for him.  On

6    July 9, 2018, Hollywood accused Roscoe of acting in an unethical manner because

7    she and her co-counsel were located in her firm's San Diego Office and the firm had

8    a Los Angeles office, insisted that they were obligated to turn the case over to

9    attorneys in Los Angeles, and asserted that he would file a motion asking the Court

10   to order that the defense of the case be turned over to attorneys in the firm's Los

11   Angeles Office.  [Dkt. 49, Ex. X.]  On July 18, 2018, an e-mail was sent to Roscoe

12   allegedly from Fairchild complaining that Roscoe's firm "has failed to transfer this

13   case to your Los Angeles office."  [Dkt. 49, Ex. JJ.]  In connection with this

14   demand, Hollywood called the Los Angeles Office of Roscoe's firm (even though

15   neither she nor her co-counsel worked there) repeatedly – often five to ten times a

16   day every 30 seconds, several times a week – and spoke with staff members in an

17   aggressive and intimidating manner.  Staff members became afraid for their safety

18   and, by June 4, 2018, security had been advised that Hollywood was not to be

19   granted access if he showed up at either the San Diego or Los Angeles Offices of the

20   firm.  [Comp. Ex. 2, Roscoe Decl., ¶ 4.]

21           In addition, when Hollywood e-mailed Roscoe, he would send the e-mails to

22   other attorneys at the firm (including a deceased named shareholder) who had no

23   involvement in the Carrows Action.  On one occasion, Hollywood called a

24   shareholder in the firm's Sacramento Office – again, who had nothing to do with

25   this case – and after engaging in a lengthy monologue of his grievances to the

26   attorney's legal secretary and complaining of the failure of Roscoe to transfer the

27   case to the Los Angeles Office, advised that he would be making similar calls to

28   other shareholders in the Los Angeles Office.  [*Id.*, ¶ 5.]  Hollywood's calls to

28

numerous attorneys who are not defense counsel in the Carrows Action was not only unjustified but, plainly, a campaign of harassment predicated on his specious belief that *he* is allowed to dictate which attorneys may represent the Defendants in the Carrows Action and therefore was entitled to bully numerous people who had nothing to do with the case.

On July 20, 2018, the Court issued an Order directed to the above situation [Dkt. 44, "July 20 Order"].  In the July 20 Order, the Court:  noted that Plaintiffs' ongoing attempts to force Defendants to respond to discovery and appear for deposition were prohibited by the Court's Initial Order [Dkt. 6, ¶¶ IV-V];  advised Plaintiffs that the e-mails sent to defense counsel were improper; noted its expectation that all parties were to behave with respect and civility toward each other and to the Court; and ordered Plaintiffs to show cause why they should not be sanctioned for their violations of both the Initial Order and Fed. R. Civ. P. 26(d)(1).  [*Id.*]  Continuing their pattern of disrespect for the Court and ignoring court orders, Plaintiffs have failed to respond to the July 20 Order.  Moreover, and even more disturbingly, rather than heed the Court's advice to behave with respect and civility to opposing counsel, Hollywood only ratcheted up his abusive behavior thereafter in each of the four actions,[17] as described below.

### b.   South Pasadena Action

The South Pasadena Action was brought by Plaintiff Hollywood alone. Hollywood failed to effect timely service of any Defendant in the South Pasadena Action, despite having been warned of the Rule 4(m) deadline and the adverse

---

[17]     As an example, on September 12, 2018, Hollywood sent an e-mail to Roscoe and her co-counsel, as well as to the Court's Courtroom Deputy Clerk, entitled, "**YOU ARE A CRIMINAL MRS. ROSCOE A.K.A. MS. WELK**," in which he accused Roscoe of perjury in connection with a declaration she made and then stated, "**YOU ARE GOING TO BE SUED!!!!!!!!**"  The Courtroom Deputy Clerk advised Hollywood that he should not send her such e-mails and stated that "it won't happen again."  As discussed *infra*, that assurance was not kept.

1   consequences that could follow if it were ignored.  [*See* Dkt. 8.]  In fact, Hollywood

2   did not seek issuance of any summons for service of process until *after* the Rule

3   4(m) deadline had passed,  [Dkts. 11-18.]  After the Court ordered Hollywood to

4   explain and establish good cause for his noncompliance with Rule 4(m) or risk

5   dismissal [Dkt. 19], he ignored the Court's directive to establish good cause and,

6   instead, simply filed copies of FedEx receipts confirming that not only did he fail to

7   pursue service of process until *after* the Rule 4(m) deadline had passed but that his

8   attempted method (by overnight mailing to Defendants) did not constitute proper

9   service of process [Dkt. 23].  Notwithstanding these defects, Defendants nonetheless

10   filed Answers to the Complaint on October 16 and 17, 2018.  [Dkts. 20, 22.]  On

11   November 5, 2018, Plaintiff Hollywood filed a First Amended Complaint with

12   exhibits, and this case was ordered stayed two days later (as discussed *infra*).

13          Even though Hollywood is aware that the Defendants in the South Pasadena

14   Action are represented by counsel, he repeatedly has sent e-mails to these

15   individuals directly, even after being told not to do so.[18]  On September 20, 2018,

16   Hollywood sent a mass e-mail to numerous attorneys and parties involved in all of

17   these four cases – including four of the Defendants in this action – in which he

18   bragged that he is a "genius" and belittled the law schools counsel had attended in

19   various respects, describing them as schools "nobody has ever heard of"

20   notwithstanding that they included such top tier law schools as UCLA and Boalt,

21   among others.  Hollywood also belittled the appearance of one of the female defense

22   attorneys in a cruel manner.  [Comp. Ex. 74.]  On October 1 and 8, 2018,

---

24   [18]     While some of the e-mails discussed herein were sent by Hollywood alone, in many
25   instances, they bear signatures of both Hollywood and Fairchild at the bottom of the e-mails.  [*See,*
     *e.g.,* Comp. Exs. 68-78, 82, 84-85, and 87-88 – various September and October 2018 e-mails.]
26   Given other matters discussed in this Report, it seems highly unlikely, if not impossible, that
     Fairchild herself affixed her electronic signature to the e-mails, but for argument's sake, the Court
27   will assume this was done with her knowledge and approval, rather than that Hollywood has
     committed fraud.  If these e-mails were sent with Fairchild's permission to affix her "signature,"
28   she – along with Hollywood – is responsible for their content.

Hollywood again sent mass e-mails that went to four of the Defendants in this case, among other people.  [Comp. Exs. 75, 78.]  On October 17, 2018, Hollywood sent another mass e-mail missive to the Defendants and their counsel, in which he, *inter alia*:  accused one Defendant of being a racist; made homophobic comments about certain defense counsel; said "**SCREW YOU**"; expressed his hope that the Defendants and their counsel would "**ALL DIE OF CANCER FOOL**"; and concluded with the flourish of "**FUCK THE POLICE!!!!!!!!!!!!!**"  [Comp. Ex. 80.]  Even though Defendants had appeared through counsel, Hollywood continued to e-mail them directly, including by e-mails sent October 21, 22, 23, 25, 28, and November 4 and 7, 2018.  [Comp. Exs. 82-84, 86, 88-90.]  In his October 28, 2018 e-mail, Hollywood again expressed his wish that various Defendants and police and municipal entities would "**DIE OF CANCER AND YOUR FAMILIES AS WELL!!!!**"  [Comp. Ex. 88; *see also* Comp. Exs. 5-7, Declarations of three of the individual Defendants in the South Pasadena Action, authenticating the e-mails they received and describing their contents.]

Hollywood has displayed a special animus with respect to defense counsel David M. Ferrante, which seems to be based to a significant extent on the fact that Ferrante is gay.  Inexplicably enraged after Ferrante appeared in the case and filed an answer on behalf of Defendant City of South Pasadena on October 16, 2018, Hollywood called Ferrante and commenced a "hate-filled rant" against lawyers and police officers, which included anti-gay remarks.  Ferrante ended the call and Hollywood called back several times.  When Ferrante said he would not tolerate any more name calling and bigoted remarks, Hollywood advised Ferrante that he had been taping the calls, without Ferrante's consent, and when Ferrante told him this was illegal, Hollywood said he did not care.  Hollywood began ranting about "homos," indicating he liked some but not others.  Hollywood ended the call by threatening to come to Ferrante's office to "deal with [him] in person," which Ferrante understood to be a threat of violence.  [Comp. Ex. 3, Declaration of David

31

M. Ferrante, ¶ 5.]  On October 17, 2018, Hollywood sent another mass e-mail, in which he:  advised that Ferrante was blocked from e-mailing him; stated that he had no gay friends; his "people do not associate with homosexuals" but he is not homophobic because he chooses "to not be around faggots"; stated that while he does not "HATE ALL HOMOSEXUALS IN THE WORLD," he hates many; used the terms "FAGGOT" and "FAGGOTS" to described South Pasadena Library employees with whom he has had altercations; and exclaimed in conclusion, "**FUCK GAY PEOPLE!! TELL THE JUDGE THAT!!!!!!!!!!**"  [Comp. Ex. 81.]

Even though (as discussed below) District Judge Bernal had stayed the South Pasadena Action and the other three actions on November 7, 2018, Hollywood called the Pasadena and Irvine offices of Ferrante's firm repeatedly on January 11, 2019, insisting that a message be taken for Ferrante and accusing one of the receptionists of being a "racist."  Hollywood noted that Ferrante was upset with him because Hollywood had called him a "faggot" and implausibly claimed he did not know Ferrante was gay.  [Dkt. 32.]  On January 8, 2019, Hollywood sent an e-mail to Ferrante and defense counsel in the other three actions in which he labelled himself "the best self-represented litigant in the world" and the "greatest rapper of all time," and called one defense lawyer a "PIG" and a "**LOSER**" and threatened to file a State Bar complaint and a civil RICO complaint against him and defense counsel in two of the other cases.  [Dkt. 31.]  Hollywood also stated that "THERE WILL BE NO SETTLEMENTS IN" the upcoming lawsuits he intended to file against defense counsel under RICO, and that he no longer would communicate with any defense attorney by telephone or e-mail and they were required to communicate with him only by mail, although defense counsel could serve him by e-mail.  [*Id.*]  On January 15, 2019, Hollywood sent an e-mail to one of the South Pasadena Action defense attorneys in which he described the Defendants' attorneys as "STUPID" and "**LYING, DEVIL WORSHIPPING, CROOKED, HOMOSEXUAL WHITE COLLAR CRIMINALS.**"  [Dkt. 33-1.]  On January 21,

2019, Hollywood sent an e-mail addressed to defense counsel in these four cases but seemingly directed at South Pasadena Action defense counsel Ferrante in which Hollywood:  repeatedly accused Ferrante of being a racist, apparently because his law firm was open on Martin Luther King, Jr. Day; said, "**I REALLY HATE YOU!**"; repeatedly called Ferrante "**FOOL**" and "**STUPID**"; state that he would continue to call the Irvine office of Ferrante's firm and refused to contact the Pasadena office, notwithstanding that Ferrante works in the Pasadena office and no lawyers in the Irvine office are counsel in the South Pasadena Action; again called Ferrante "feminine" and stated, "**I ALSO HOPE YOUR ENTIRE FAMILY DIES OF CANCER AND I HEREBY CURSE YOU AND YOUR FAMILY YOU STUPID FOOL**"; bragged about having made $1,500 in charitable donations; reiterated his previously-expressed disdain for gay people, stating (among other things) "**TWO TYPES OF PEOPLE I DO NOT LIKE AT ALL! GAY AND LESBIAN!!**" and "**I DO NOT BELIEVE IN HOMOSEXUALITY AND I REFUSE TO ASSOCIATE OR MAKE FRIENDS WITH HOMOSEXUALS**" and "**ANY MAN WHO IS WITH ANOTHER MAN IS NOT A MAN AT ALL!**"; and threatened Ferrante that "**ONCE THIS CASE IS OVER YOU HAVE A PERSONAL VISIT COMING FROM ME AT YOUR PASADENA AND IRVINE OFFICE. YOU CAN CALL THE POLICE, FILE FOR A RESTRAINING ORDER. ALL OF YOUR EFFORTS WILL LEAD YOU TO NO WHERE.**"  [Case No. 2:18-cv-05607, Dkt. 38 at 21-23.]

### c.    2200 Ontario Action

This lawsuit stems from Plaintiffs' stay at the Ontario Gateway Hotel owned by Defendant 2200 Ontario, LLC.  On August 13, 2018, Defendant filed an unlawful detainer action against Plaintiffs in San Bernardino County Superior Court Case No, UDFS1804764 (the "Unlawful Detainer Action").  [Comp. Ex. 9,

Declaration of David Yu ("Yu Decl.") ¶ 5.][19]  Six days later, Plaintiffs brought this action.

After Defendant filed a motion to dismiss the complaint [Dkt. 11] and VL Motion 2 [Dkt. 13], Plaintiffs promptly filed an amended complaint, thereby mooting the motion to dismiss [Dkt. 18].  Pursuant to an Order by the Court, Defendant's response to the amended complaint was due by October 29, 2018. Defense counsel Yu thereafter sought to obtain an extension of time to respond, but Plaintiffs failed to respond to any of his telephone, facsimile, or e-mail requests about the desired extension and/or an intended application for the same.  As a result, Defendant was forced to file an application for an extension of time, which Plaintiffs vigorously opposed, which in turn required the Court to become involved in a matter that should not have needed Court intervention had Plaintiffs behaved in a professional and appropriate manner.  The Court granted an extension of time until November 28, 2018.  [Dkts. 21-23.]

In the course of the above-described proceedings in the 2200 Ontario Action, the Court became aware of several disturbing matters indicating that, in addition to their earlier-noted violations of the Local Rules, Plaintiffs were engaging in ongoing violations of other Local Rules.  As a result, on October 30, 2018, the Court issued another Order directed to Plaintiffs' misbehavior.  [Dkt. 25.]  As the Order noted, Hollywood had admitted under penalty of perjury that defense counsel had been unable to reach him because Hollywood had blocked defense counsel from reaching

---

[19]     Based on the Court's review of the docket for the Unlawful Detainer Action, it appears that the parties stipulated to judgment in favor of 2200 Ontario, LLC on or about January 22, 2019, in lieu of the trial set for January 28, 2019, and that Judgment was entered on or about January 24, 2019.  A mandamus petition that Hollywood earlier filed in the California Court of Appeal on November 28, 2018, was denied on March 22, 2019 (No. E071691).  Shortly thereafter, 2200 Ontario, LLC dismissed a separate action it had filed against Hollywood seeking a workplace violence restraining order against him (San Bernardino County Superior Court Case No. CIVDS1831242, Feb. 5, 2019 minute order.)  On March 22, 2019, the California Court of Appeal denied a mandamus petition that Hollywood had filed on January 18, 2019, in connection with this action (No. E072008).

him by phone or e-mail – conduct that violated Local Rule 5-4.8.1.  As also

explained therein, based on admissions made by Hollywood and Fairchild under

penalty of perjury in another of these four actions, it is clear that:  Fairchild had

delegated her representation in this and all other past and present cases to

Hollywood, in violation of Local Rule 83-2.2.1; Hollywood had drafted *all*

documents filed in all of Plaintiffs' cases and only he had e-filed documents;

Fairchild was unable to comply with the District's requirements for e-filing

privileges; and Plaintiffs had made false representations in their applications for

permission to e-file.[20]  Based on these sworn statements by Plaintiffs, the Court

revoked their e-filing privileges in the 2200 Ontario Case.  [Dkt. 25]

In addition to the above litany of bad behavior, Plaintiffs continued to

disregard the Court's Orders precluding them from conducting discovery without

leave of Court.  As in the Carrows Action, in the 2200 Ontario Action, the Court had

issued an Initial Order in this case expressly advising the parties that discovery was

prohibited until the Court issued an order allowing it.  [Dkt. 10.]  Even apart from

the explicit notice they received from these two Orders, it is beyond question that,

based on the events that occurred in the Carrows Action described earlier, as of July

20, 2018, Plaintiffs knew that the Court would not tolerate any further disregard of

that Initial Order; indeed, the Court had signaled its intent to sanction them for such

conduct.  Despite knowing they were prohibited from doing so, on or about

November 6, 2018, Plaintiffs issued a Fed. R. Civ. P. 45 subpoena to the Ontario

Police Department.[21]  Perhaps Plaintiffs believed the Court would not find out

---

[20]     In his declaration, Hollywood described Fairchild as "completely stupid, ignorant,
uneducated, unknowledgeable, and incompetent" about legal matters and "tech illiterate." [*See*
Dkt. 38-2 in the Public Storage Action.]  In various e-mails he has sent in these four actions, he
has made similar comments.  [*See, e.g.,* Comp. Ex. 77 – October 3, 2018 e-mail in which
Hollywood states: "I AM THE ONE WHO KNOWS ABOUT LAW. ALISON KNOWS
NOTHING ABOUT LAW FOOL. EXCEPT WHAT I TELL HER ABOUT IT!!".]

[21]     The Court received an envelope in response to that subpoena, sent by mail by the Ontario

because this discovery was directed to a third party, or perhaps Plaintiffs simply did not care if it did.  In any event, this was yet another intentional violation of a court order.

As is perhaps unsurprising by this point, as in the other cases, Hollywood continued his modus operandi of sending inappropriate and disturbing e-mails to defense counsel in this case.  On September 15, 2018, after defense counsel Yu sent an e-mail to Plaintiffs seeking to meet and confer before filing VL Motion 2, Hollywood responded by e-mail on the morning of September 15, 2018, stating that: Plaintiffs would not meet and confer, as required by the Local Rules; "**THERE WILL BE NO SETTLEMENT TALKS**"; he would be filing "**TEN LAWSUITS**" in the future against Yu's clients and their employees; and "**YOU ARE A SCUMBAG ATTORNEY THAT REPRESENTS SCUMBAG IMMIGRANTS AND AL[L] FAMILY MEMBERS WILL BE SUED IN SEPARATE LAWSUITS!!!!!!!!!!!!**"  [Dkt. 13-2, Declaration of David Yu in support of VL Motion 2, Ex. 2.]  On the evening of September 16, 2018, Hollywood sent a mass e-mail to Yu and other attorneys as well as individuals affiliated with the various Defendants, in which he told Yu to "**HEAD BACK TO LAW SCHOOL FOOL**" and called Yu a "**MORON**."  [*Id.*, Ex. 7.]  A little over an hour later, Hollywood sent another mass e-mail, including to Yu, in which Hollywood:  stated, "HEY DAVIE GOOD NEWS! I CAME UP WITH ONE DEFENSE TO YOUR FRIVOLOUS MOTION," followed by a photograph of Hollywood extending his middle finger; and called Yu a "SORRY LAME ATTORNEY BUTT FOOL!!!!!!!!!!"  [Comp. Ex. 67.]

The insults and abusive behavior did not stop there.  After Defendant filed its Reply in support of VL Motion 2, on October 10, 2018, Hollywood sent an e-mail to Yu (as well as to numerous other persons not involved in the 2200 Ontario Action

---

Police Department, which it has not opened but has held onto for now in light of the stay in this case and the fact that this discovery taken by Plaintiffs was prohibited.

case) entitled "PAUL SONG [co-counsel with Yu] IS AN IDIOT," and then: called the Reply "kindergarten"; repeatedly called Yu and his client "FOOL"; asserted that he was making lots of money day trading and would use his proceeds to "**SUE ATTORNEYS AND DEFENDANTS ALIKE THAT HAVE VIOLATED MY RIGHTS AND ALISON'S RIGHTS FOR THE FINAL YEAR. I WILL BE FILINGS LAWSUITS FOOLS!!!!!**"; called counsel "SCUMBAG ATTORNEYS" and "LIFETIME LOSERS!!"; stated, "YOU ATTORNEYS ARE LYING ASS VEXATIOUS ATTORNEYS!!"; and closed with, "**I AM COMING FOR YOU HELEN JUST AFTER FEW MORE WEEKS OF DAY TRADING YOU WILL BE SUED!!!!!!!!!**" [Dkt. 20, ECF ## 965-969.] After Yu advised Hollywood, on October 24, 2018, that his client (Nina Li, who was affiliated with the Defendant herein) would be seeking a temporary restraining order against him because he had "been threatening the staff at the Ontario Gateway Hotel . . . with physical harm," Hollywood responded in an e-mail in which he threatened to sue Li in "**FOUR SEPARATE LAWSUITS**" (including one for seeking the TRO), threatened to depose "every single employee" at the hotel, accused Yu of "LYING TO THE COURT" in seeking an extension of time to respond to the amended complaint, and accused Yu of pursuing "EVIL AND CORRUPT PLANS" to disrupt Plaintiffs' lives. [Comp. Ex. 85.]

Hollywood did not reserve his homophobia for counsel Ferrante in the South Pasadena Action. On October 17, 2018, Hollywood sent an e-mail to numerous individual defendants and their counsel, including Yu, in which he stated (in a reference to Yu and Ferrante), "NOW I GOT TOW [*sic*] FEMININE DAVIES TO DEAL WITH." [Comp. Ex. 80.] Approximately 40 minutes later, Hollywood sent another mass e-mail, and in a comment directed to counsel Ferrante, stated "I AM BLOCKING YOU DAVIE, JUST LIKE I BLOCKED YOUR FEMININE DAVIE YU COUNTERPART." [Comp. Ex. 81.] On October 25, 2018, Hollywood sent a mass e-mail to defendants and their attorneys in various cases in which he

37

1   denigrated all of the attorneys as "garbage" and referred to "DAVIE, AND HIS

2   LOVER PAUL SONG."  [Comp. Ex. 88.]

3          Hollywood took particular offense at defense counsel's use of his birth

4   name[22] in their state court filings, managing to infuse his irrational fury with racism.

5   On December 13, 2018, Hollywood sent an e-mail to Yu and numerous others

6   accusing Yu's clients of committing perjury in connection with the declarations they

7   submitted in support of the requested restraining order.  In the course of this e-mail,

8   Hollywood advised them that he changed his name to Arogant Hollywood in 2005,

9   in Kent, Washington.  [Comp. Ex. 92.]  On December 24, 2018, Hollywood sent Yu

10  and others an e-mail entitled "MY NAME IS AROGANT YOU STUPID ASS

11  GOOKS."  [Comp. Ex. 93.]  That "gook" has only a derogatory and racist meaning

12  is beyond dispute; there can be no question that Hollywood intended such a meaning

13  in using the term.[23]  On December 27, 2018, Hollywood sent another mass e-mail

14  entitled "MY NAME IS AROGANT HOLLYWOOD YOU BITCH ASS ARDENT

15  LAW GROUP HOMOSEXUALS!!!" in which he stated that he would sue Yu's law

16  firm for slander and defamation for indicating his original name was John Walton in

17  the Unlawful Detainer Action.  [Comp. Ex. 94.]

18

19          **d.   Public Storage Action**

20          The Public Storage Action stems from Plaintiffs' rental of storage units in a

21

22  _____

23  [22]    It has been the Court's understanding that Hollywood's birth name was John Walton but
    that he changed his name to Arogant Hollywood at some point.  *See, e.g.,* the LASC Vexatious
    Litigants Order at p. 2 ("At a March 1, 2016 hearing in Department 52 in Case BC 602 190, Mr.
24  Hollywood stated that his legal name is John Walton.")

25  [23]    Given that Hollywood's various federal court lawsuits uniformly are based on the premise
26  that the actions of the defendants were motivated by racism because some of them allegedly
    utilized racist slurs (such as "nigger"), the disheartening irony of his choice to use an equally
27  offensive racist slur to describe opposing counsel in these same federal civil rights cases, along
    with his repeated homophobic language directed at defense counsel and persons affiliated with
28  defendants (including the term "faggot"), is not lost on the Court.

Public Storage facility in Montclair.  Plaintiffs' complaint sets forth their version of the altercations that took place between between Hollywood and Public Storage employees, which led to Public Storage's efforts to terminate the leases and Plaintiffs losing access to their units except under specific conditions.

Those events led Public Storage to seek protection from Hollywood in the state courts.  On June 29, 2018, in San Bernardino County Superior Court Case No. CIVDS1816489, Judge Gilbert Ochoa issued a temporary restraining order against Hollywood, directing him to stay at least 100 yards away from three Public Storage employees and the Montclair Public Storage facility.  [Declaration of John Walker ("Walker Decl.), Comp. Ex. 62.]  On August 9, 2018, Judge Ochoa held a hearing and issued a three-year workplace violence restraining order against Hollywood, again ordering him to stay 100 yards away from the three employees and the Montclair facility.  [Comp. Ex. 63.]  On September 6, 2018, Judge Ochoa issued an Order barring Hollywood from entering his courtroom unless Hollywood had a court hearing at a specific date and time, for the stated reason that "Hollywood has caused multiple disturbances when dealing with courtroom staff."  [Dkt. 27-1 at ECF #742; *see also* Dkt. 35, District Judge Bernal's Order of October 4, 2018, summarizing these events.]  Hollywood appealed Judge Ochoa's Orders (No. E071263); his appeal was dismissed on October 22, 2018, but later was reinstated at his request.  After Hollywood continued to fail to comply with his appellate obligations, the appeal was dismissed on April 24, 2019, his motion to vacate the dismissal was denied on July 2, 2019, and the remittitur issued on that same day.

After Judge Ochoa issued the three-year restraining order against Hollywood, Plaintiffs filed their Complaint in this case.  [Dkt. 1]  The sole served Defendant (Public Storage) thereafter filed three motions:  a motion to compel arbitration [Dkt. 32]; a motion to strike strategic lawsuit against public participation [Dkt. 33]; and a

motion to dismiss the complaint [Dkt. 34].[24]  As of October 29, 2018, after Public

Storage filed its reply and related evidentiary objections to declarations submitted

earlier with Plaintiff's opposition, briefing was completed on the arbitration motion.

[Dkts. 43-45.]  Nonetheless, without seeking permission to do so, Plaintiffs

subsequently filed a further declaration and exhibits in connection with that motion,

which were ordered stricken.  [Dkts. 46-47.]  On October 28, 2018, without seeking

leave to do so, Plaintiffs filed two duplicative amended complaints, which were

untimely under Fed. R. Civ. P. 15(a)(1)(b) and thus unauthorized; as a result, they

were stricken.  [Dkts. 40-41, 47.]  In short, in this action, like in the other three

cases, Plaintiffs have continued their pattern of behaving as if rules and deadlines do

not apply to them.

      Continuing the behavior he displayed in the preceding three actions,

Hollywood has sent uncivil and plainly inappropriate e-mails to Public Storage's

counsel and others, often triggered by his unwarranted outrage over Public Storage's

filings in this case and in the state court.  On September 20, 2018, Hollywood e-

mailed Walker and stated that he would be bringing separate lawsuits for malicious

prosecution/false arrest and one based on the restraining order issued by Judge

Ochoa.  [Comp. Ex. 69.]  In a September, 2018 e-mail sent to Walker and many

others (including defense counsel Yu in the Public Storage Action), Hollywood

threatened to increase the list of e-mail recipients to 300, because "**MANY OTHER**

**DEFENDANTS WILL JOIN YOU,**" bragged that none of the recipients could do

his "job" because they are not "**SMART ENOUGH,**" and threatened the police

officer defendants in his cases, stating, "**I GOT SOME RAP MUSIC COMING**

**YOUR WAY THAT WILL SHAKE EVERY BONE IN YOUR COWARD**

---

[24]     A month after this case was filed, Public Storage filed an unlawful detainer action against
Hollywood in San Bernardino County Superior Court Case No. FS1806212.  Following a
September 9, 2019 trial, at which Hollywood did not appear, judgment was entered in favor of
Public Storage on September 12, 2019, and a writ of possession issued on September 17, 2019.

1    **BODIES, AND HAVE YOU WATCHING YOUR BACK, AND OVER YOUR**

2    **SHOULDERS EVERY TIME YOU START WORK!!!!!!**"  [Comp. Ex. 70.]

3           Hollywood has sent Walker and Public Storage employees repeated e-mails

4    threatening to sue them for their actions taken in this case and in connection with the

5    restraining order.  [Comp. Exs. 72, 73, 76, and 77 – September 25 and 26, 2018, and

6    October 1 and 3, 2018 e-mails.]  On October 28, 2018, Hollywood sent a mass e-

7    mail and, referring to one of the recipients (Bradley Wayne Hughes, Jr., the son of

8    Public Storage's founder), stated: "**JUNIOR GET READY FOR YOUR**

9    **DEPOSITION YOU FAKE ASS CHRISTIAN !!!  I DON'T CARE HOW**

10   **RICH YOU GET YOU GOING TO BURN IN HELL FOR THIS SHIT YOU**

11   **DID TO ME AND ALISON.  FIRE AND HELL FOR YOUR FAKE**

12   **CHRISTIAN ASS.**"  [Comp. Ex. 88.]  And as in the other cases discussed above,

13   although Walker repeatedly told Hollywood he did not consent to have their

14   telephone conversations recorded, Hollywood nonetheless has done so.  [Walker

15   Decl. ¶ 25; Comp. Ex. 72.]

16          Hollywood's e-mails continued to make made clear that his interest is not in

17   seeking and obtaining an appropriate resolution of his claims but, rather, in abusing

18   and threatening Defendants and their counsel.  In the above-noted September 24,

19   2018 mass e-mail Hollywood sent to various defense counsel and persons employed

20   at their clients, Hollywood said:  he could "CARE[]LESS ABOUT SETTLEMENT

21   MONEY FROM ANY DEFENDANT" and "**I DO NOT NEED ANY**

22   **SETTLEMENT MONEY**"; "INSTEAD OF RECEIVING MONEY I WOULD

23   MUCH RATHER PUNCH EACH DEFENDANT AND THEIR ATTORNEY

24   DEAD IN THE FACE"; "ALL YOU DEFENDANTS ARE SCUMBAGS, YOUR

25   ATTORNEYS ARE SCUMBAGS," "YOU AND YOUR ATTORNEYS ARE ALL

26   WORTHLESS PEOPLE," and "NONE OF YOU ARE VERY BRIGHT"; and

27   "YOU ALL DESERVE HIGH LEGAL BILLS."  [Comp. Ex. 70.]  In addition,

28   Hollywood stated:  "**EACH ONE OF YOU ARE BROWN EYED, GREEN**

1   EYED, HAZEL EYED AND BLUE EYED DEVILS, AND/OR AUNT

2   JEMIMAS AND UNCLE TOMS. BUT MAINLY VERY LIGHT SKIN

3   DEVILS, SOME DARK SKINNED DEVILS, ALL DEVILS

4   NONETHELESS." [*Id.*]  Hollywood proclaimed: "YOU WILL ALL KNOW

5   HOW MUCH I HATE EACH ONE OF YOU, AND WOULDN'T HELP YOU

6   IF YOU WERE BEING ATTACKED OR COULD NOT ESCAPE FROM A

7   BURNING HOUSE OR CAR, NONE OF YOU ARE WORTH SAVING. YOU

8   ARE ALL A POOR EXCUSE FOR HUMANITY." [*Id.*]  Hollywood continued,

9   claiming that "bad people" like the over 60 e-mail recipients are the reason why

10  people shoot up schools, malls, video game contests, Rite Aids, and courthouses,

11  *i.e.*, because "THEY WERE ALL MISTREATED BY PIECE OF CRAP

12  PEOPLE LIKE YOURSELVES." [*Id.*]  Finally, Hollywood threatened to  create

13  documentaries, music, television shows, and films about Defendants to embarrass

14  them, noting with satisfaction that "YOU MIGHT GET VIOLENT THREATS

15  TO YOUR HOMES AND BUSINESS AFTER I PUBLISH THE WRONGFUL

16  ACTS OF EACH DEFENDANTS AND THEIR ATTORNEYS. AND I SAY

17  GOOD, BECAUSE THAT'S EXACTLY WHAT EACH OF YOU

18  SCUMBAGS DESERVE BECAUSE AGAIN, YOU ARE NOT GOOD

19  PEOPLE!!!!!!!" [*Id.*]  Hollywood also included gang terminology in his e-mails as

20  an implicit (or perhaps not so implicit) threat, specifically, the term "SUWU."[25]

21  [Comp. Exs. 67, 88.]

22              **e.    All Four Actions**

23      Plaintiffs, admittedly, are pursuing these four cases in direct violation of

24  Local Rules 5-4.8.1 and 83-2.2.1.  According to both Hollywood and Fairchild,

25  Hollywood is handling all matters in the cases on Fairchild's behalf,

26

27  [25]     An Internet search reveals that "SUWU" is a call Bloods gang members make to

28  announce their presence.  *See, e.g.,* https://urbandictionary.com/define.php?term=suwu <viewed
    September 10, 2019>.

notwithstanding that he is not an attorney and may not legally represent her. Fairchild has stated, under penalty of perjury, that:  she is not competent to handle legal matters and issues; "Arogant drafts all legal papers; all the pleadings, all the motions, all the discovery, every single thing"; "Arogant does everything"; and the only thing she does "is sign papers after he carefully reads and explains anything legal to me."  [Public Storage Action Dkt. 38-1.]  As Hollywood has stated under penalty of perjury – after calling Fairchild "completely stupid, ignorant, uneducated, unknowledgeable and incompetent" about legal matters – "[e]very single law document, civil rights complaint, pleadings in this Court and state court we ever filed were all created and drafted by me."  [*Id.*]

In short, Hollywood admittedly is acting in violation of California Business and Professions Code § 6125 by engaging in the unauthorized practice of law by drafting documents to be filed by Fairchild in the various state and federal cases described herein and providing her with legal advice.  *See, e.g., Birbrower, Montalbano, Condon & Frank v. Superior Court*, 17 Cal. 4th 119, 128 (1998) (under Section 6125, practicing law includes doing and performing services in a court in the various stages of a legal matter, as well as legal advice and the preparation of legal documents regardless of whether or not litigation is involved); *Estate of Condon*, 65 Cal. App. 4th 1138, 1142 (1998) (under this statute, practicing law includes legal advice and preparing legal documents).  Moreover, Fairchild is not properly a party in these cases given that she has opted to have a non-lawyer represent her.  *See Ryan v. Hyden*, 581 Fed. Appx. 653, 654 (9th Cir. June 27, 2014) (affirming dismissal of plaintiff's case without prejudice, pursuant to a Local Rule similar to this District's Local Rule 83-2.2.1, because she allowed a non-lawyer to represent her by drafting her pleadings and submissions and, thus, he effectively was acting as her counsel and practicing law under California law).

In addition, Hollywood repeatedly has disregarded this Court's Orders and engaged in improper ex parte communications, in violation of Local Rule 83-2.5.  In

an October 2, 2018 Order in the 2200 Ontario Action, the Court:  addressed Hollywood's practices of copying the Courtroom Deputy Clerk on e-mails directed to defense counsel that were not properly directed to court personnel and of frequently contacting the Courtroom Deputy Clerk in a manner that violated Local Rule 83-2.5; and explicitly cautioned Hollywood that he must cease communicating with the Courtroom Deputy Clerk except for legitimate case-related matters.[26] [2200 Ontario Action Dkt. 30.]  Hollywood thereafter ignored the Court's October 2, 2018 Order repeatedly and egregiously.

On October 27 (twice) and 29, 2018, Hollywood sent e-mails that were addressed directly to opposing counsel in the above four cases, individual employees and officials of two cities and of certain of the Defendants, prosecutors, and inexplicably, this Court's Courtroom Deputy Clerk and (in two instances) a Supervisor in the Clerk's Office for this District.  On October 31, 2018, following the receipt of certain e-mail communications sent by Hollywood, the Court issued essentially identical Orders in all four of these pending cases.  As the Court noted,[27] "[t]hese e-mails were, in substantial part, bombastic, vitriolic, profane, threatening, and wholly unprofessional and inappropriate" and "[t]hey should not have been sent to opposing counsel in the first instance and, plainly, should not have been sent to third parties and to Court personnel."  The Court expressly cautioned Hollywood as follows:

> Hollywood has been warned to cease this abusive and improper behavior, and he has disregarded that warning.  His behavior constitutes an abuse of the Court's personnel, is grossly unprofessional, and violates Local Rule 83-2.5.  Hollywood appears to believe that

---

[26]     This same Order also noted that the Courtroom Deputy Clerk earlier had warned Hollywood to cease copying her on e-mails sent to opposing counsel that did not involve the Court.

[27]     Carrows Action Dkt. 72; South Pasadena Action Dkt. 24; Public Storage Action Dkt. 26; and 2200 Ontario Action Dkt. 48.

1
2
3

> uncivil, abusive, and obstructive behavior and outrageous
> threats constitute appropriate and effective advocacy, but
> he is sorely mistaken.  Hollywood is cautioned that any
> further behavior of this sort will be deemed to constitute
> contempt of Court and will subject him to sanctions.

4      Hollywood not only did not heed the Court's warning but apparently took it

5   as a challenge, given that he then engaged in conduct in response that purposefully

6   violated the Court's October 2018 Orders.  Within approximately two hours of

7   Plaintiffs' electronic receipt of the Court's October 31, 2018 Orders, in response,

8   Hollywood directly e-mailed the Courtroom Deputy Clerk and the same Clerk's

9   Office Supervisor.  His e-mail contained the subject line "YOU LOVE GETTING A

10  BLACK MAN IN TROUBLE" and attached a photograph of an Aunt Jemima

11  pancake batter box, coupled with his assertion that he "WILL NOT BE

12  INTIMIDATED BY THE JUDGE AND HER SOLD OUT COURT CLERK" and

13  his threat that he would be filing "**AT LEAST FIVE NEW LAWSUITS IN**

14  **NOVEMBER 2018**."

15     Several moments later, Hollywood commenced forwarding to the same

16  Courtroom Deputy Clerk and Clerk's Office Supervisor numerous e-mails

17  containing Federal Express tracking information for shipments Hollywood had sent,

18  even though there was no reason whatsoever for this information to be provided to

19  Court personnel.  Hollywood apparently arranged to have Federal Express contact

20  the Courtroom Deputy Clerk directly regarding various of his Federal Express

21  shipments, as over the next days, she received multiple tracking update e-mails

22  directly from Federal Express.

23     There was no legitimate reason for Hollywood to send this personal

24  information to the Courtroom Deputy Clerk and a Court Supervisor.  Moreover, not

25  only was sending them the above-noted "Aunt Jemima" e-mail offensive and

26  improper, it was contemptuous.  It is clear to the Court that Hollywood did so with

27  the intent to harass Court staff and to demonstrate his disregard for the Court and its

28  Orders and to make plain his intent not to follow them.

Based on the foregoing events, on November 7, 2018, District Judge Bernal issued an Order staying all four of these pending actions (the "Stay Order").[28]  In the Stay Order, Judge Bernal recounted much of Plaintiffs' above-described behavior and found, *inter alia*:

> By his October 31, 2018 e-mails, Hollywood – who, by his and Fairchild's sworn admissions, is the driving force and decisionmaker in these four cases – has made it abundantly clear that he considers himself not bound by Magistrate Judge Standish's Orders and has shown that he does not intend to abide by them. Hollywood also has repeatedly displayed his willingness to act in a directly contemptuous and disrespectful manner to both the Court and its personnel as well as to opposing counsel.  This Court's and the Magistrate Judge's ability to handle these four cases (including their numerous pending motions) efficiently and expeditiously and to control their dockets has been hampered by above events and Plaintiffs' improper and contemptuous behavior.  The Court is deeply troubled by Hollywood's numerous grossly improper e-mails as well as Plaintiffs' ongoing violations of and disregard for the Local Rules and defiance of Court Orders.  Hollywood's belief that he is exempt from proceeding in a civil manner in compliance with the rules that govern his cases and is entitled to flout those rules and court orders and treat both the Court and opposing counsel in a grossly disrespectful manner is not only unfounded but one that that justifies sanctions.
>
> . . . .
>
> Plaintiffs' improper behavior in these four cases described above has consumed an inordinate amount of Court time and resources while, at the same time, interfering with the efficient management of these cases. By their obstructive behavior and flouting of the Rules that govern them, Plaintiffs have imposed unwarranted burdens on the Court and its personnel and opposing counsel.

[Stay Order at 9-10, 12.]

District Judge Bernal imposed a stay of all four actions as a sanction issued

---

[28]   Carrows Action Dkt. 73; South Pasadena Action Dkt. 29; Public Storage Action Dkt. 50; and 2200 Ontario Action Dkt. 30.

against Plaintiffs pursuant to Rule 16(f) of the Federal Rules of Civil Procedure, as well as pursuant to a district court's inherent power to control its own dockets and in light of Plaintiffs' ongoing failures to abide by Court Orders and Local Rules. District Judge Bernal ordered the parties to file concurrent further submissions regarding VL Motion 1 and VL Motion 2 by January 8, 2019.  District Judge Bernal further cautioned the parties that "the failure to comply with and abide by *this* Order will impact the Court's ultimate ruling on Vexatious Litigant Motion 1 and Vexatious Litigant Motion 2 and may lead to sanctions."  [Stay Order at 12-13.]

Perhaps not surprisingly, Plaintiffs failed to comply with the Stay Order. They did not file a timely and concurrent further submission by the January 8, 2019 deadline, as ordered.  And as described earlier, after the Stay Order issued, Hollywood continued to send obnoxious e-mails and make telephone calls to the offices of defense counsel in the South Pasadena Action.[29]

## DISCUSSION

By VL Motion 1 and VL Motion 2, the Defendants in the above four actions ask that Plaintiffs be declared to be vexatious litigants who should be required to obtain leave of court before making future filings in these cases, or for such other

---

[29]     The Court notes that, in the Compendium [Exs. 60-61], Defendants have included court documents related to Los Angeles Superior Court Case No. BC693583, *Rachel Dusa, et al. v. Donald T. Sterling Corporation, et al.* (the "Dusa Case").  The Dusa Case was brought by tenants of a Santa Monica apartment building, who alleged, *inter alia*, that:  in October 2017, Hollywood moved into the apartment of an "infirm" tenant, and though his behavior, caused her to move out in fear of him; over the following months, he terrorized the tenants with threats and bad behavior, including shouting profanities, filming them, and yelling at a 5-year-old child, making a slicing motion across his throat, and yelling at the mother, "You heard me, you stupid fucking bitch!"; Hollywood threatened a maintenance worker and then threw water and soap on the floor of a common area; Hollywood took over a common area by setting up a desk and file cabinets and glaring at and insulting tenants when they walked by; Hollywood threw shredded paper over the entire third floor and stairwells and dumped water in front of a tenant's apartment; etc.  While these allegations, if proven, are consistent with Hollywood's behavior in the four present cases, the Court has chosen not to consider the Dusa Case allegations and exhibits in connection with its analysis herein.

relief as the Court deems just and proper, including requiring Plaintiffs to post security in these actions before they may proceed.

## I.      The Governing Standards

"Flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants."  *De Long v. Hennessey*, 912 F.2d 1144, 1148-49 (9th Cir. 1990).  As the Supreme Court has observed:

> Every paper filed with the Clerk of this Court, no matter how repetitious or frivolous, requires some portion of the institution's limited resources.  A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice.

*In re McDonald*, 489 U.S. 180, 184 (1989) (finding that the "continual processing of petitioner's frivolous requests for extraordinary writs does not promote that end" and prohibiting the petitioner from proceeding in forma pauperis in filing future petitions for extraordinary writs).  "'The goal of fairly dispensing justice . . . is compromised when the Court is forced to devote its limited resources to the processing of repetitious and frivolous requests.'"  *Whitaker v. Superior Court of California, San Francisco*, 514 U.S. 208, 210 (1995) (*per curiam*) (citation omitted) (when petitioner had filed 24 petitions, including 15 within the last four Terms, all of which had been denied – directing Clerk to refuse any further certiorari petitions from the petitioner in noncriminal filings unless he paid the filing fee).

To prevent against such abuse, "[t]here is strong precedent establishing the inherent power of federal courts to regulate the activities of abusive litigants by imposing carefully tailored restrictions under the appropriate circumstances."  *Tripati v. Beaman*, 878 F.2d 351, 352 (10th Cir. 1989).  The Ninth Circuit has emphasized that district courts "bear an affirmative obligation to ensure that judicial resources are not needlessly squandered on repeated attempts by litigants to misuse the courts.  Frivolous and harassing claims crowd out legitimate ones and need not

be tolerated repeatedly by the district courts." *O'Loughlin v. Doe*, 920 F.2d 614, 618 (9th Cir. 1990).  The All Writs Act allows federal courts to meet that obligation by affording district courts with the inherent power to "enjoin[] litigants with abusive and lengthy histories."  *De Long*, 912 F.2d at 1147; *see also* 28 U.S.C. § 1651(a); *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007). Additionally, this District's Local Civil Rule 83-8.1 provides:

> It is the policy of the Court to discourage vexatious litigation and to provide persons who are subjected to vexatious litigation with security against the costs of defending against such litigation and appropriate orders to control such litigation.  It is the intent of this rule to augment the inherent power of the Court to control vexatious litigation and nothing in this rule shall be construed to limit the Court's inherent power in that regard.

When a litigant has "abused the Court's process and is likely to continue such abuse," the Court may (1) "order a party to give security . . . to secure the payment of any costs, sanctions or other amounts which may be awarded against a vexatious litigant"; or (2) "make such other orders as are appropriate to control the conduct of a vexatious litigant."  Local Rules 83-8.2, 83-8.3.  "Such orders may include, without limitation, a directive to the Clerk not to accept further filings from the litigant without payment of normal filing fees and/or without written authorization from a judge of the Court or a Magistrate Judge, issued upon such showing of the evidence supporting the claim as the judge may require."  Local Rule 83-8.2.

In *De Long*, the Ninth Circuit set forth the requirements that must be satisfied before pre-filing restrictions may be entered against a vexatious litigant: (1) the litigant must be given notice and opportunity to be heard before the order is entered; (2) the court must compile an adequate record for review; (3) the court must make substantive findings that the litigant's filings are frivolous or harassing; and (4) the vexatious litigant order may not be overly broad, and must be "narrowly tailored to closely fit the specific vice encountered."  *De Long*, 914 F.2d at 1147-48; accord

*Molski*, 500 F.3d at 1057.[30]

The Court now turns to the above-described four factors to determine whether they are satisfied here.

## II.    Notice And Opportunity To Be Heard

The first factor simply requires that the litigant be given an opportunity to oppose a vexatious litigant order before it is entered. *De Long*, 912 F.2d at 1147. It does not require an in-person or telephonic hearing or an evidentiary hearing or oral argument. *See Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) (holding that "an opportunity to be heard does not require an oral or evidentiary hearing on the issue" and that the "opportunity to brief the issue fully satisfies due process"); *accord Molski*, 500 F.3d at 1058-59 (citing *Pac. Harbor* with approval).

As discussed earlier, after VL Motion 1 was filed, Plaintiffs failed to file a timely Opposition and did not seek any extension of time to do so. Accordingly, on May 31, 2018, the Court issued an Order taking VL Motion 1 under submission. Almost four months passed, and then Plaintiffs filed a motion to "strike" VL Motion 1, the Court opted to liberally construe that filing as Plaintiffs' Opposition to VL Motion 1 and agreed to consider it, despite its grossly untimely and unauthorized nature. After Defendants filed a Reply, Plaintiffs waited 15 days and then filed a second Opposition to the VL Motion 1, which the Court again agreed to consider despite its unauthorized nature. After VL Motion 2 was filed, Plaintiffs filed their Opposition on September 30, 2018, with related declarations and exhibits. [2200

---

[30]    In addition, in considering whether to designate a litigant as vexatious, Local Rule 83-8.4 provides that "[a]lthough nothing in this Rule shall be construed to require that such a procedure be followed, the Court may, at its discretion, proceed by reference to the Vexatious Litigant statute of the State of California, Cal. Code Civ. Proc. §§ 391-391.8." In this instance, the Court's vexatious litigant analysis and conclusions have been made pursuant to its inherent authority under the All Writs Act and under the Local Rules, <u>not</u> under California's Vexatious Litigant statutory framework.

1    Ontario Action Dkt. 14.]  They also filed a request to vacate the hearing set for VL

2    Motion 2, which the Court did.  [Dkts. 15-16.]  As noted earlier, the Stay Order

3    required the parties to filed *concurrent* further submissions on January 8, 2018, but

4    Plaintiffs failed to avail themselves of that opportunity afforded them, nor have they

5    sought any relief from their default.

6            Plaintiffs have had more than ample opportunities to oppose VL Motion 1 and

7    VL Motion 2, and they actually have done so.  In addition, they will be entitled to

8    file objections to this Report.  The first factor plainly is satisfied.

9

10   **III.    Compilation of Adequate Records to Review**

11           "An adequate record for review should include a listing of all the cases and

12   motions that led the district court to conclude that a vexatious litigant order was

13   needed."  *De Long*, 912 F.2d at 1147.  "At the least, the record needs to show, in

14   some manner, that the litigant's activities were numerous or abusive."  *Id.*  The

15   second *De Long* factor, thus, requires the Court to compile a list of actions and

16   filings by Plaintiffs that serve as the basis for a finding that they are vexatious

17   litigants.  *See also Ringgold-Lockhart*, 761 F.3d at 1063-64 (finding the second

18   factor satisfied when the district court "discussed and explained the litigation history

19   leading to its order, and appended a list of twenty-one district court filings,

20   including motions, that it viewed as supporting its order," as well as noted the

21   litigant's extensive history of state court litigation in the body of its order, and cited

22   to a California Court of Appeal decision that discussed that history and declared the

23   litigant to be vexatious under California Code of Civil Procedure § 391(b)(3)).

24           In the foregoing, lengthy Procedural Background Section, the Court has listed

25   and discussed Plaintiffs' numerous prior state and federal cases.[31]  As that

26

27   ───────────────

[31]     Plaintiffs' filing history in other courts – including the California courts – is relevant to,

28   and properly a part of, the third factor analysis.  *See, e.g.*, *Molski v. Mandarin Touch Restaurant*,

discussion shows, in early 2016, Plaintiffs were declared to be state court vexatious litigants following an eight-month period – May 2015, through January 2016 – in which they filed 25 lawsuits, none of which were successful.  As of the date of this Report, Plaintiffs' names remain on the State of California's Vexatious Litigant List maintained by the Judicial Council for the State of California.  The Court properly may take judicial notice of this List.  *See Rupert v. Bond*, No. 12-cv-05292-LHK, 2013 WL 5289617, at *5 (N.D. Cal. Sept. 18, 2013).  Additionally, the foregoing procedural discussion shows that, over a two-year period, Plaintiffs have filed 21 lawsuits in this Court, of which the present four are the only ones that remain pending.  That discussion describes what happened in each of those cases, including in the numerous cases that were dismissed as untimely and for failure to state a claim upon which relief can be granted.

The second *De Long* factor is met here.

## IV.   Substantive Findings Of Frivolousness And Harassment

The third *De Long* factor requires the Court to look not only at filing volume but also the content of the litigant's filings to determine whether the prior actions were frivolous or harassing.  *De Long*, 912 F.2d at 1148 (before issuing a pre-filing order, a court must make a substantive finding that the litigant's actions were frivolous or harassing); *see also Molski*, 500 F.3d at 1059 ("An injunction cannot

---

359 F. Supp. 2d, 924, 927 (C.D. Cal. 2005) (district court reviewed cases filed in Northern District as well as in Central District); *Steinhart v. Barkela*, No. C-11-03497-EDL, 2013 WL 3814330, at *1-*3 (N.D. Cal. July 19, 2013) ("Plaintiff's history in this and other courts shows that she is a vexatious litigant."; looking at Northern District and Sonoma County Superior Court cases); *Perry v. Veolia Transport*, No. 11-CV-176-LAB, 2011 WL 4566449, at *10 (S.D. Cal. Sept. 30, 2011) (looking to both state and federal cases to find plaintiff vexatious); *Walker v. Stanton*, No. EDCV 08-24-VAP (OPx), 2008 WL 4401388, at *9-*10 (C.D. Cal. Sept. 2, 2008) (the District Court looked to both state court and federal court filings in conducting its third factor analysis and in finding the plaintiff to be a vexatious litigant); *see also Ringgold-Lockhart*, 761 F.3d at 1065-66 (making clear the propriety of looking at the plaintiff's "pattern of state court litigation" when conducting a federal court vexatious litigant analysis).

1    issue merely upon a showing of litigiousness.  The plaintiff's claims must not only

2    be numerous, but also be patently without merit.").  This analysis may include

3    determining whether the litigant is filing "numerous, similar complaints" and/or

4    whether the litigant "is attempting to harass a particular adversary."  *In re Powell*,

5    851 F.2d 427, 431 (D.C. Cir. 1988) (a decision on which the Ninth Circuit relied in

6    *De Long*).

7

8          **A. Frivolousness**

9          In determining that Plaintiffs are vexatious litigants, Los Angeles Superior

10   Court Judge Brazile found a "substantive lack of merit in the pleadings they file."

11   He cited as one example the earlier-noted state court case in which Hollywood took

12   offense at the music being played by a man using an ATM, stole the man's car keys

13   out of his car, threw them over a building's rooftop, and Plaintiffs then sued the man

14   because he called the police to report the crime Hollywood had committed.  Judge

15   Brazile cited another example, in which Hollywood behaved in an abusive and

16   threatening manner toward Del Taco employees yet sued them because they called

17   the police based on his threatening behavior.  Judge Brazile noted the frivolous

18   nature of the Plaintiffs' tort claims given that, by their own pleading admissions, it

19   was Hollywood's wrongdoing that caused the events over which Plaintiffs sued.

20   Judge Brazile observed that Plaintiffs' state court complaints followed a "familiar

21   pattern," in which Hollywood would instigate and/or escalate a situation that, in

22   turn, would cause those subjected to his behavior to call the police, Hollywood

23   would threaten litigation and often already be recording the situation, Hollywood

24   would be detained and/or arrested on occasion, and then both Plaintiffs would sue,

25   alleging a host of purported injustices heaped upon them by the defendants.

26          The actions filed by Plaintiffs in this District follow that same "familiar

27   pattern" and the findings of frivolousness made by Judge Brazile are equally apt

28   here.  The Court's earlier procedural discussion demonstrates that, in a two-year

1   period, Plaintiffs have filed 21 lawsuits in this Court, of which the present four are

2   the only ones that remain pending.  Fourteen of those cases were filed within one

3   year's time, with the fifteenth several months later (the "15 Cases").[32]  Of the 15

4   Cases, three were denied for an inadequate showing of indigency alone, and the

5   other 12 were dismissed based not only on that same ground but also due to repeated

6   Court findings of a lack of merit, including due to untimeliness and failure to state a

7   claim upon which relief can be granted and, in one instance, the improper re-filing

8   of a prior action with the intent to circumvent a court order.  As to those 12 cases,

9   the Court advised Plaintiffs in detail of the defects readily apparent on the faces of

10  their complaints and in their attempts to federalize their state law claims, including

11  the patent lack of state action in most instances, yet Plaintiffs continued to file new

12  actions repeating these same defects again and again.[33]

13  _____

14  [32]    Apart from the 15 Cases, Plaintiffs filed two additional cases in the Spring of the next year.

15  The Court assumes that those two cases settled, as they were dismissed voluntarily without any

16  sort of motion practice.  That Plaintiffs may have been able to obtain settlements in two of their
    cases is of no moment for purposes of the Court's analysis.  Cases (whether frivolous or not) are

17  settled by defendants for all sorts of reasons, but even if the fact that two of Plaintiffs' cases
    settled could lead to an inference that at least some of the claims alleged therein had merit, this

18  does not preclude finding that their filings and conduct as a whole still satisfy the third *De Long*
    factor, as discussed *infra*.  "Frivolous litigation is not limited to cases in which a legal claim is

19  entirely without merit."  *Molski*, 500 F.3d at 1060.  In *Molski*, the subject of the vexatious litigant
    order was a disabled person who filed almost 400 cases against various restaurants and businesses

20  under Title III of the Americans With Disabilities Act, often successfully obtaining cash
    settlements.  *Id.*  The Ninth Circuit nonetheless upheld the district court's vexatious litigant order,

21  finding the plaintiff's "litigation strategy evidenced an intent to harass businesses," even though
    his claims for damages "might have been legally justified."  *Id.*

22
            Here, that two of Plaintiffs' cases may have caused the defendants therein to decide to

23  settle does not cloak Plaintiffs' numerous other dismissed federal cases with any patina of merit

24  and preclude a finding of frivolousness or harassment.  As the Ninth Circuit has made clear in the
    context of assessing a federal court's inherent power to impose sanctions for bad faith, even the

25  assertion of a colorable claim will not preclude sanctions if the party asserting it is substantially
    motivated by vindictiveness or obduracy; a finding of total frivolousness or even a lack of merit is

26  not required if willful improper conduct is involved.  *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir.
    2001) (citations omitted).

27

28  [33]    As discussed above briefly, in the bulk of the Orders dismissing the 15 Cases, the Court

Plaintiffs appealed 11 of the above-dismissals.  In nine of the appeals, the Ninth Circuit dismissed the appeals with express findings of frivolousness, and in two others, dismissed for failure to prosecute.

In addition to serially filing new lawsuits in this District, over a two-year period, Plaintiffs have improperly removed state court unlawful detainer actions to federal courts in at least three instances of which the Court is aware.  In one instance, Hollywood removed a Los Angeles unlawful detainer action to a New York District Court while admitting expressly in his papers that he knew the New York court was the wrong venue for the removal.

As noted earlier, the complaints Plaintiffs have filed often numbered hundreds of pages.  In fact, the 15 Cases complaints together total over 1,600 pages.  These prolix pleadings were replete with argumentative, scabrous, and vituperative assertions regarding the defendants, characterizing their conduct with hyperbole, such as allegations that store employees who called the police were trying to "murder" and "kill" Hollywood, or calling the defendants "evil."  [*See, e.g.,* Dkt. 1 in Case No. 2:17-cv-03008; Dkt. 1 in Case No. 2:17-cv-05004.]  The pleadings

---

repeatedly expressed its concern about Plaintiffs' ongoing submission of apparently false and inconsistent financial information.  Remarkably, although the Court stated its specific concerns regarding Plaintiffs' financial submissions on many occasions, Plaintiffs ignored the Court's concerns and continued to proffer over and over the same obviously incomplete, inconsistent, and misleading financial information.  In May 2017, the Court expressed its concern about the discrepancies between Plaintiffs' sworn allegations regarding their bank account balances that they had made *before* they commenced suffering IFP application denials based on an inadequate showing of indigency and the markedly lower amounts they stated in their sworn allegations about those same bank account balances made *thereafter*.  [*See, e.g.,* Dkt. 23 in Case No. 2:17-cv-02253, noting, among other things, Plaintiffs' gross reductions of the bank balances previously stated, such as from $2,481 to $47, $2,924 to $90, $2,585.40 to $45, etc.]  Nonetheless, Plaintiffs continued to repeat these inconsistent, markedly reduced allegations in their subsequently-filed cases.  [*See, e.g.,* Dkt. 14 in Case No. 2:17-2449; Dkt. No. 10 in Case No. 2:17-cv-02450; Dkt. No. 14 in Case No. 2:19-cv-02451; Dkt. No. 8 in Case No. 2:17-03008; Dkt. No. 11 in Case No. 2:17-05004; Dkt. No. 10 in 2:17-cv-05005; etc.]  Additionally, in July 2017, Fairchild began omitting from her IFP applications the SSI monies she received monthly and, inexplicably, she continued to do so even after the Court pointed out this omission to her.  [*See, e.g.,* Dkt. No. 3 in Case No. 2:17-cv-05562; Dkt. Nos. 3 and 6 in Case No. 2:17-cv-05919; Dkt. Nos. 3 and 6 in Case No. 2:17-cv-08535.]

typically would repeat text multiple times and include lengthy dissertations on various state and federal laws in dramatic fashion, colored by Plaintiffs' views of the impetus and operability of such laws and coupled with case and statutory citations and quotations, leading to their bloated and unwieldy nature, and Plaintiffs did so repeatedly after the Court had cautioned them that including such matters within their complaints was improper.  [*See, e.g.,* Complaints in Case Nos. 2:16-cv-06392, 2:16-cv-06459, 2:17-cv-00864, 2:17-cv-01143, 2:17-cv-01195, 2:17-cv-02253, 2:17-cv-02449, 2:17-cv-02450, 2:17-cv-02451, 2:17-cv-3008, 2:17-cv-03519, 2:17-cv-05005.]

Indeed, in many instances, it was clear that in their rush to file new lawsuits, Plaintiffs simply had cloned prior defective complaints and failed to changes names and dates, often rendering their allegations nonsensical or difficult to follow.  [*See, e.g.,* Dkt. 1 at ¶ 171, Case No. 2:17-cv-02253 (reference to wrongdoer as Studio Lodge Hotel, a non-defendant); Dkt. 1 at ¶¶ 16-21, 33-34 and p. 72 ¶ Y, Case No. 2:17-cv-05004 (alleging, under oath, inconsistent times and scenarios for matters on which the complaint was based; and stating that relief was sought against Starbucks Corporation, a non-defendant); Dkt. 1 at ¶¶ 13, 19 1/2, 19 1/3, 26, 28, 29, 60, 137, 218, 281, 284, 344, and pp. 86-86, ¶¶ Q-R, U-V, Case No. 2:17-cv-8535 (in a mind bending display of scenarios impossible under the rules of time, alleging that the incident in question (resulting in Hollywood's arrest and criminal charges) took place in November 2017, yet that Hollywood somehow spent time in jail as a result of that incident from April 29, 2016, through May 4, 2016, before the incident occurred; yet again, inconsistently, that the criminal complaint was not filed until May 2, 2016, and that Hollywood was not arrested and placed into custody until after that date, but somehow that charges were dismissed on May 2, 2016, before he was arrested; yet again inconsistently that the incident happened on November 10, 2016, and that charges were dropped on May 4, 2017; and in a final inconsistency, that the incident happened on November 7, 2015, but that Defendants swore to the

1    charges against him nine months earlier, on January 24, 2015).]

2        Given the sheer volume of Plaintiffs' filings in the 15 Cases, it would be an

3    undue burden to address the meritless nature of each of them in detail.  Moreover,

4    and in any event, the Court's prior merits dismissal Orders in 12 of these cases,

5    which are cited earlier, already have done so.  To give a sense of the frivolous nature

6    of Plaintiffs' claims, however, the Court notes the following.

7        The two cases that Plaintiffs initially filed in this District (Nos. 2:16-cv-06392

8    and 2:16-cv-06459) stemmed from disputes that arose after Hollywood and

9    Fairchild moved into another person's rental home and drove that tenant out.  The

10   16-6459 Complaint's own sworn allegations and exhibits show that:  the tenant

11   (Gordon) invited Hollywood to stay as a kindness to help him get off the street;

12   within a day of moving in, Hollywood got into an altercation with another tenant on

13   the property (Lewis) when she took the trash cans out at a time he did not like;

14   Hollywood moved Fairchild into the house without Gordon's permission;

15   Hollywood began acting abusively toward Gordon and caused her to fear for her

16   safety; and although she obtained a restraining order, his behavior caused her to

17   vacate her long-time home after her attempt at having him evicted failed.  Plaintiffs

18   sued Gordon, the landlord, and persons involved in the eviction proceedings,

19   alleging, *inter alia*, that Gordon harmed them by seeking a restraining order and

20   taking her own personal property with her when she left (which Plaintiffs apparently

21   believed they were entitled to keep), that they were the victims of racial and

22   disability discrimination because the landlord somehow was legally required to enter

23   into a rental agreement with them (he was not) but refused to do so and to make

24   disability-related modifications to the rental home, and that the unlawful detainer

25   proceedings filed against them were improper because they purportedly were lawful

26   tenants.  While the Order dismissing the 16-6459 case outlines in more detail the

27   patently frivolous nature of Plaintiffs' claims and allegations (many of which gave

28   rise to Fed. R. Civ. P. 11 concerns), the Court notes one particularly specious

57

example: Plaintiffs sued the landlord under 42 U.S.C. § 2000d, even though the verified Complaint admitted that the rental home in question was privately-owned.

In the 16-6392 case, the Complaint set forth what purported to be a verbatim transcription of a recorded exchange between Hollywood (who just happened to be wearing and to have activated his "spy sunglasses" while jumping rope at 5:50 a.m. in the shared driveway) and the other tenant (Lewis), which occurred after Hollywood repeatedly opened the driveway gate for the property and Lewis advised him that the gate needed to be kept shut so her dogs would not get out.  Hollywood reacted angrily, telling Lewis not to talk to him, to get out of his face, refused to keep the gates closed, threatened to sue her for racial discrimination when she said she would call the police (noting that she was white), asked her if she knew who she was "fu***** with," stated that he would sue the "s*** out" of her, and when she suggested he get a job, responded by bragging about how much money he made as a day trader and told her to shut her mouth.  Later that night, Hollywood again opened the gate and turned on his GoPro camera, apparently in anticipation of triggering another altercation.  Lewis's boyfriend and Hollywood thereafter had an unspecified "confrontation" in which, according to a third party neighbor witness, Hollywood took a swing at the boyfriend, the police were called (although Hollywood was not arrested), and Lewis thereafter obtained a restraining order against Hollywood. Hollywood sued Lewis and her boyfriend alleging that they violated Hollywood's federal civil rights and committed various state law torts.  Again, as in the state courts, the Complaint itself demonstrates a situation in which Hollywood behaved badly and instigated a confrontation and then, having provoked a predictable reaction involving the police, sues.

Case Nos. 2:17-cv-02450 and  2:17-cv-02451 repeat that pattern.  Both arise from a situation which Hollywood took offense that private company workers were performing noisy work on a public street, admittedly threatened to cut the tires on their work truck and then removed tire caps from the truck, and was arrested after

the police were called and the workers reported that Hollywood had threatened

them.  Case Nos. 2:17-cv-05005 and 2:cv-08535 similarly involve situations that, as

shown by the Complaint allegations, rested on a by now familiar scenario.

Hollywood began arguing with, and threatening to sue, private business employees

(here, of coffee chains), the police were called and, when they arrived, told

Hollywood to leave, he refused, and after the employees signed private citizen's

arrest forms, Hollywood was cuffed and detained in a cell before being released.

These examples are but some of the broader pattern of Plaintiffs' pursuit of

frivolous litigation in this District.  As in the state court lawsuits found to be

vexatious, Plaintiffs' federal lawsuits follow the "familiar pattern" of Hollywood

creating or escalating a situation, sometimes records the incident and threatens

litigation, the targets of his behavior call the police, and he sometimes is arrested,

with both he and Fairchild claiming a wealth of damages as a result.  As the state

court found, Plaintiffs have been engaging in this specific type of litigation as a way

of life for some years now.  Indeed, Hollywood's email address of record in his

federal lawsuits is "causeofaction[varying numbers]@gmail.com."

Having failed in the state courts and been declared vexatious, Plaintiff have

tried their luck in this District by attempting to recast many of their dismissed state

court lawsuits as claims resting on alleged federal civil rights, ADA and/or other

federal law violations, as well as bringing new cases stemming from further

Hollywood-instigated situations.  In the various screening Orders that issued in 12

of the 15 Cases, the Court explained to them in detail the defects in their supposed

federal claims, including the statute of limitations requirements, the lack of state

action in the situations about which they sued, and their failure to plead adequately a

conspiracy-based federal civil rights claim, among other things.  Undeterred,

Plaintiffs continued to bring often untimely actions that pleaded the same defective,

boilerplate assertions of alleged federal law violations arising out of by now

repetitive incidents, *i.e.*, in which Hollywood instigates yet another altercation with

private persons (while coincidentally having turned on his recording device), makes threats to sue, and, as a result of his behavior, finds himself subject to dealing with the police and possible criminal charges.  These apparent attempts to manufacture lawsuits have failed to date, and the consistent rejection of Plaintiffs' claims supports a finding of frivolousness.[34]

### B.   Harassment

Regardless of the conclusion that the frivolousness requirement is satisfied by the nature of Plaintiffs' many actions, their repetitive and harassing nature is an independent basis for finding that the third *De Long* factor is satisfied.

As an "alternative to the finding of frivolousness" required by the third *De Long* factor, a court may consider the factor satisfied if the litigant's claims "show a pattern of harassment."  *De Long*, 912 F.2d at 1148.  The Ninth Circuit has found that the following method of analysis promulgated by the Second Circuit in *Safir v. U.S. Lines, Inc.*, 792 F.2d 19 (2d Cir. 1986), provides "a helpful framework" for applying the third *De Long* factor:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an

---

[34]   While the Court has not discussed herein the defects of the complaints filed in the pending four cases, this does not mean that these pending cases are not frivolous, as were the earlier 13 cases dismissed for a lack of merit.  The frivolous nature of these pending complaints, instead, will be addressed in one or more separate Reports and Recommendations regarding the pending defense motions to dismiss, anti-SLAPP motion, and motion to compel arbitration.  Suffice it to say that the complaints filed in these four cases suffer from many of the same defects identified in the dismissal orders filed in the earlier 13 cases, including a lack of state action for the federal civil rights claims containing the under color of state law requirement, grossly-inadequate allegations of Section 1981 violations and alleged conspiracies, and plainly defective assertions of ADA violations.  In any event, the frivolous nature of the prior 13 cases alone supports finding the third *De Long* factor met, regardless of any defects in the pending four complaints.

unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

*Molski*, 500 F.3d at 1058 (quoting *Safir*, 792 F.2d at 24).

As discussed earlier, in the LASC Vexatious Litigants Order proceedings, the Los Angeles Superior Court found that Plaintiffs had engaged in patterns of: splitting their claims into two, concurrent lawsuits yet failing to file related case notices, thereby leading to the potential for duplication of judicial resources and the specter of forum shopping; filing unmeritorious pleadings and engaging in delaying tactics; and quickly dismissing lawsuits should they receive any pushback from the defendants, such as a demurrer or anti-SLAPP motion.

Plaintiffs have engaged in some of these same patterns in the 15 Cases.  In many instances here, they have split their lawsuits in two for no legitimate reason, and repeatedly have failed to file the Notice of Related Case required in each such instance.  [*See, e.g.,* Case Nos. 2:16-cv-6392 and 2:16-cv-06459, 2:17-cv-2253 and 2:17-cv-02449, and 2:17-cv-02450 and 2:17-cv-02451.]  On another occasion, after United States District Judge R. Gary Klausner denied their IFP applications and directed them to pay the filing fees or face dismissal (Case No. 2:17-cv-00864), a mere eight days later, they simply re-filed their complaint under a new case number and again sought leave to proceed on an IFP basis (2:17-cv-01195), apparently hoping that another Judge in this District would be assigned the successive case and not be aware of Judge Klausner's pending Order.  Plaintiffs have improperly and repeatedly removed state court unlawful detainer actions brought against them, knowing of the impropriety of their actions.  And as described in detail earlier, Plaintiffs have engaged in a wealth of uncivil and outrageous conduct in the four currently-pending cases that cannot be described as anything other than behavior intended to harass defense counsel and make the litigation more costly and difficult, both the for the Court and the Defendants.

In the Carrows Action, Plaintiffs repeatedly pursued inappropriate defaults

61

and ignored the Court's clear advice that filing new evidence in response to a Rule 12(b)(6) motion would be inappropriate.  Plaintiffs ignored Court deadlines and Local Rule requirements related to pending motions.  Hollywood made frivolous demands that defense counsel "transfer" the case to lawyers in a different office and when they did not do so, harassed firm lawyers and staff who had nothing to do with the Carrows Action.  Moreover, although the Court had told them they could not do so, Plaintiffs engaged in discovery and repeatedly made baseless and improper threats and demeaning comments to defense counsel in connection with the improper discovery efforts and otherwise, including Hollywood stating that he wished to "begin our WAR."  Hollywood recorded telephone conversations over defense counsel's objections.  As his September 13, 2018 e-mail shows, Hollywood appeared to rejoice in increasing Defendants' costs and in the potential for doing so with other Defendants.  Perhaps most indicative of Plaintiff's intent to harass, after the Court issued an Order on July 20, 2018, essentially telling Plaintiffs to cease their inappropriate and uncivil behavior, they only ratcheted it up, becoming more abusive to other parties and more contemptuous of the Court.[35]

In the South Pasadena Action, Hollywood repeatedly contacted the represented parties directly with shockingly rude and hateful e-mails that belittled the parties' attorneys and repeatedly expressed the wish that the parties and their families would contract and die from cancer.  As described earlier, Petitioner repeatedly made homophobic comments to one of the defense attorneys (who is gay) and others, along with repeatedly threatening to sue defense counsel for their efforts to represent their clients.  Hollywood continued to tape calls with defense counsel

---

[35]    The Court acknowledges that some of its language describing Plaintiff's behavior could be viewed as harsh, but it is accurate.  The Court has handled the vast majority of Plaintiffs' cases filed in this District and has spent huge amounts of time reviewing the submissions in these four cases, as well as in all prior cases brought by Plaintiffs here, and while the Court ordinarily might not use such colorful language in an opinion, in this instance, there is no other accurate way to capture and describe the level of vitriol, abusiveness, incivility, and other bad behavior in which Plaintiffs have engaged.

over counsel's objection.  Without justification, Hollywood stated that he refused to allow defense counsel to communicate with him by telephone or mail, although he was happy to receive service copies by e-mail, and despite this proclamation, one week later, felt free to send an insulting e-mail to defense counsel calling them stupid, liars, devil worshippers, crooked, and "homosexual white collar criminals." Plaintiffs threatened to move to strike the City of South Pasadena's Answer simply because they did "not like it," as well as to seek to strike future Answers filed by Defendants – a motion that would have been frivolous and improper and which would have been made only for the purpose of harassment.  [Comp Exs. 80, 88.]

In the 2200 Ontario Action, even though Defendant had until midnight on September 19, 2019, in which to electronically file its response to the complaint on a timely basis (and in fact did so late in the afternoon), Hollywood called defense counsel's office every hour that day and, at 2:11 p.m., sent an e-mail improperly threatening to file a default request even while acknowledging that Defendant actually had until midnight to file.  [Ontario Action Dkt. 13-2, Ex. 11.]  In violation of the Local Rules, Hollywood repeatedly threatened to block defense counsel from contacting him and then did so, admittedly in retaliation for Defendants' court filings.  [*See id.*, 13-2, Exs. 5, 13.]  It also became clear that, in violation of the Local Rules, Hollywood was purporting to represent Fairchild, even though he may not do so.  In further violation of the Local Rules, Plaintiffs refused to meet and confer as requested by defense counsel and blocked defense counsel from contacting them.  The Court further became aware that, as in the Carrows Action and in direct violation of a Court Order, Plaintiffs pursued discovery.  Critically, they did so *after* the advice received in the Carrows Action that their attempts to pursue discovery violated a Court Order.  And as in the Carrows Action and the South Pasadena Action, Hollywood repeatedly sent abusive and insulting e-mails to defense counsel in the 2200 Ontario Action, containing belittling and homophobic comments, continuing threats to sue defense counsel and their clients, and racist epithets.

1    In the Public Storage Action, Plaintiffs have continued their pattern of

2   sending e-mails directly to represented parties filled with abusive comments and

3   threats, repeatedly expressing Hollywood's hatred for the parties and their attorneys.

4   Hollywood made clear, as in the other cases, that he is not interested in receiving

5   money or in settlement and described how he would prefer to punch the parties and

6   their attorneys "dead in the face" and to increase their legal bills.  Plaintiffs filed a

7   frivolous ex parte application for a TRO on the purported ground that they needed a

8   federal court order granting them access to their locked storage units at the

9   Montclair Public Storage facility, even though they admitted, in their moving

10  papers, that Public Counsel's attorney already had advised them that they would be

11  permitted access to their units to retrieve their property during business hours and

12  after giving notice, and the record showed that Plaintiffs simply had not bothered to

13  do so.  [*See* Public Storage Action Dkt. 35 at 4 (District Judge Bernal's Order

14  denying the TRO application, finding Plaintiffs' allegations of the circumstances

15  allegedly causing irreparable injury to be "frivolous" and "untrue").]  Plaintiffs,

16  thus, not only forced Defendants to incur time and expense responding to this

17  frivolous application but wasted valuable and limited judicial resources by forcing

18  the Court to deal with an application that should not have been brought.  And as in

19  the 2200 Ontario Action, Plaintiffs refused to meet and confer as requested by

20  Defendants prior to filing their motion to dismiss and other motions, with

21  Hollywood insisting tersely that he did not want to meet and confer because the

22  complaint was "sufficient" [Comp. Ex. 68], thereby precluding any possibility of

23  narrowing the issues before the Court.

24    As the Court's earlier discussion made clear, Hollywood has not confined his

25  threats and disrespect to the parties and their counsel.  He repeatedly has engaged in

26  improper ex parte communication attempts with Court staff, even after the Court

27  told him not to do so.  In fact after the Court warned him that his profane and

28  inappropriate e-mails sent to the defense and Court staff would not be tolerated and

1    would subject him to sanctions, in direct response, Hollywood promptly sent an

2    offensive, racist e-mail to the Court's Courtroom Deputy Clerk and a Clerk's Office

3    Supervisor, threatening that he would not be allow himself to be "intimidated" by

4    the Court and would file more lawsuits in this District.

5          Apart from the frivolous and repetitive nature of the complaints Plaintiffs

6    have filed in this District, their behavior in the four pending/non-dismissed cases

7    demonstrates a level of harassing and vexatious conduct that is remarkable.  *See*

8    *Azam v. Fed. Dep. Ins. Corp.*, No. CV 15-3930-JLS, 2016 WL 4150762, at *10

9    (C.D. Cal. Jul. 19, 2016) (as assessment of frivolousness and harassment "is not

10   limited to the filing of complaints").  While any one of Plaintiffs' actions – if

11   construed on its own and divorced from the broader pattern of their behavior –

12   might not warrant a finding of harassment, when examined in the aggregate, these

13   acts inescapably lead to the conclusion that Plaintiffs are motivated by

14   vindictiveness and a desire to harass.  In each of the four pending federal cases,

15   Plaintiffs have engaged in a concerted and protracted campaign of obstruction and

16   abuse designed to harass Defendants and their counsel and to increase the costs to

17   the defense,[36] as well as to interfere with the Court's ability to manage these cases –

18    

19   [36]    In their various Opposition papers, Plaintiffs assert that neither the prior 15 Cases nor the
20   currently pending four cases have caused any "legal costs" to defense counsel.  Plaintiff also assert
     that they have not imposed "any financial burden" on the Court, because they paid the filing fee in
21   the pending four cases.. [*See, e.g.,* Carrows Action Dkt. 59 at 15-16 and Dkt. 69 at 20; 2200
     Ontario Action Dkt. 14 at 14-15.] These assertions are patently ludicrous.  As quoted earlier, in e-
22   mails, Plaintiffs have reveled in their belief that some of the Defendants had incurred $15,000 in
     fees as of September 2018, and their expectation that any other Defendants who did not roll over
23   would suffer "a similar fate."  It is plain that the Defendants in these four cases have incurred
     substantial fees and costs in light of their filings in these actions, both in responding to the
24   complaints  and, in the Carrows Action, in being forced to deal with the discovery improperly
     sought by Plaintiffs. [*See* Comp. Ex. 2, Roscoe Decl., ¶ 9, stating that Plaintiffs' conduct
25   engaging in improper discovery caused the Defendants in the Carrows Action to incur attorney's
     fees that would not have been incurred in the ordinary course of litigation; Comp. Ex. 9,
26   Declaration of John Walker, ¶ 28, stating that the burden and expense of defending the Public
     Storage Action had been "very substantially increased" by the prolix nature of the complaint and
27   the various ex parte applications Plaintiffs' filed in the case.] In addition, Judges in this District

28

hence, leading to the need for the Stay Order.  The Court finds that Plaintiffs have engaged in a pattern of egregious and willful litigation misconduct in these four cases, which has increased the defense costs and efforts, abused the process of the Court, and diverted the Court and its strained resources from addressing other actions and other litigants' needs.

Based on their conduct, it is plain that Plaintiffs believe themselves not to be bound by the Local Rules or the Court's Orders and feel free ignore them on a consistent basis, even after the Court has directed them to comply.  It is equally plain that Plaintiffs believe themselves not to be bound by any notions of civility toward others or respect for the Court, and that litigation for them is not only a way of life, as the state court found, but a means by which they can attempt to inflict pain on those against whom they feel aggrieved, as opposed to a process for resolving civil disputes.  Indeed, as their earlier-quoted e-mails state, Plaintiff have no interest in meeting and conferring to try to avoid litigation disputes as they arise or to discuss settlement; rather, they wish to increase the defense costs and make the litigation as difficult as possible through whatever means they can, even if doing so violates federal law, the Local Rules, and Court Orders and unduly burdens the Court and its staff.  *See Mellow v. Sacramento County*, No. CIV-S-08-0027-LKK EFB, 2008 WL 2169447, at *5 (E.D. Cal. May 23, 2008) (finding plaintiff who had filed nine precious actions to be a vexatious litigant, because she "treats the federal court in this district as her own personal stick with which to beat those who she believes makes her life more difficult, or who disagree with her sometimes vitriolic viewpoint. The relatively de minimis filing fees in federal court make this possible.

_____

and their staff have expended substantial time and efforts screening the 15 Cases described above and, as outlined earlier, this Court and District Judge Bernal have expended substantial time and efforts dealing with Plaintiff's noncompliance and improper and meritless filings in these four cases – indeed so much so that the Stay Order needed to be imposed.  The time spent on these efforts not only is far from insubstantial but takes away from the Court's ability to deal with other, potentially meritorious cases.  Plaintiffs' assertion that their conduct has not caused any unnecessary burden on the Court or expenses to Defendants is untethered to reality.

For a mere $350 [Plaintiff] can force her protagonists to spend thousands of dollars in litigation defense costs.  Whether plaintiff wins the lawsuit or not does not matter-defendants have lost financially every time."), adopted by 2008 WL 3976873 (Aug. 21, 2008), aff'd by 365 Fed. Appx. 57 (9th Cir. Jan. 25, 2010).  The finding in *Mellow* is equally apt here.

Each of the *Safir* factors are amply met here.  The Court therefore finds that a pattern of harassment by Plaintiffs exists.

\*    \*    \*    \*    \*

In sum, whether labelled frivolous or harassing, or both, Plaintiffs' conduct satisfies the third *DeLong* factor.  "While pro se litigants are generally entitled to more leeway, a court's authority to enjoin vexatious litigation extends equally over pro se litigants and those represented by counsel, and . . . '"special solicitude [that a pro se plaintiff] must face does not extend to the willful, obstinate refusal to play by the basic rules of the system upon whose very power the plaintiff is calling to vindicate his rights."'"  *Pandozy v. Segan*, 518 F. Supp. 2d 550, 558 (S.D.N.Y. 2007) (citations omitted).  The volume of repetitive and/or substantially similar lawsuits filed by Plaintiffs, the consistent dismissal of those lawsuits as meritless, and Plaintiffs' repugnant behavior in the four pending cases and repeated flouting of Court Orders and the governing Rules amply warrant finding Plaintiffs to have acted vexatiously.  Moreover, given the volume of Plaintiffs' history of filing frivolous actions and harassing behavior, the Court finds that there is a likelihood that Plaintiffs will they will continue to act vexatiously absent some protective steps being taken.[37]  On the record before it, the Court concludes that each Plaintiff has

---

[37]    For example, in the 2200 Ontario Action, Hollywood sent an e-mail to Defendant's counsel on October 10, 2018, after Defendant had filed its Reply in support of VL Motion 2, in which Hollywood bragged that he had ample financial resources to pursue further federal court litigation due to his day trading success and that he 'HAS MONEY TO FIGHT AND SUE" and "**WILL CONTINUE TO WIN IN THE STOCK MARKET AND USE THE PROCEEDS TO SUE ATTORNEYS AND DEFENDANTS ALIKE THAT HAVE VIOLATED MY RIGHTS**

"abused the court's processes and is likely to continue such abuse, unless protective measures are taken."  Local Rule 83-8.3.  Accordingly, the Court recommends that Plaintiffs be declared vexatious litigants and that an appropriate order issue, as set forth below.

## V. The Appropriate Vexatious Litigant Order

The fourth *De Long* factor requires that any order not be overly broad and must be narrowly tailored to address the vexatious conduct at issue.  Mindful of Plaintiffs' right of access to the courts, the Court must fashion an order that balances that right with the need to protect against any continued and future abuses.  In light of Plaintiffs' egregious conduct to date, and their blatant ongoing disregard for the Court's Orders and warnings, the Court concludes that the appropriate pre-filing order should consist of three parts.

***First***, with respect to these pending four cases, the Court has found that Plaintiffs not only have abused the Court's processes, as well as have behaved abusively towards Defendants, but are likely to continue such vexatious behavior. Plaintiffs also have shown they consider themselves to be impervious to the Court's warnings that their behavior is inappropriate and may subject them to sanctions. Indeed, as described earlier, Hollywood treats the Court's warnings as a challenge and in direct response, promptly engages in conduct that is even worse, and more contemptuous, than previously, while Fairchild (who signs off on many of these offensive and improper e-mails and all of the filings) acquiesces in this behavior. Critically, Plaintiffs' behavior caused such an undue consumption of Court time and

---

**AND [FAIRCHILD'S] RIGHTS FOR THE FINAL YEAR, I WILL BE FILING LAWSUITS FOOLS!!!!!**"  Hollywood also threatened to sue someone employed at the hotel that is the subject of the 2200 Ontario Action who had filed a police report against Hollywood and stated that he would split his purported claims against her into three separate lawsuits.  [2200 Ontario Action Dkt. 20 at 6-9.]  As another example, in the Public Storage Action, Hollywood told defense counsel that "he is just going to keep filing lawsuits against the company and its employees, and that 'eventually something will stick.'"  [Comp. Ex. 9, Walker Decl., ¶ 29.]

resources and all four cases to become so unmanageable that, in light of the undue burdens being imposed on the Court and opposing counsel, District Judge Bernal was forced to take the unusual step of staying them and did so as a sanction for Plaintiffs' conduct.  Even though District Judge Bernal cautioned Plaintiffs that any failure to abide by and comply with the Stay Order would impact the pending vexatiousness determination and could lead to sanctions, Plaintiffs nonetheless promptly violated the Stay Order as described earlier.

It is plain that Plaintiffs' noncompliant and contemptuous behavior will continue and, thereby, will unnecessarily and wrongfully increase the defense fees and costs in these four cases, as well as continue to increase the unnecessary burden on the Court that such conduct entails and the likelihood that sanctions will be imposed against Plaintiffs.  Moreover, as noted above, Plaintiffs have bragged that they have ample financial resources to litigate these cases as well as future cases they intend to bring against the Defendants and others related to them.

Federal courts possess the inherent power to order a plaintiff to post security for costs.  *Simulnet East Associates v. Ramada Hotel Operating Co.*, 37 F.3d 573, 574 (9th Cir. 1994); *In re Merrill Lynch Relocation Management, Inc.*, 812 F.2d 1116, 1121 (9th Cir. 1987).  In addition, Local Rule 83-8.2 provides that "the Court may, at any time, order a party to give security in such amount as the Court determines to be appropriate to secure the payment of any costs, sanctions or other amounts which may be awarded against a vexatious litigant."[38]  One purpose of a local rule authorizing security is to allow a court to have some control over the administration of a lawsuit.  *See Ilro Productions, Ltd. v. Music Fair Enterprises*, 94 F.R.D. 76, 78 (S.D.N.Y. 1982) (citing *Leighton v. Paramount Pictures Corp.*, 340

---

[38]     Plaintiffs assert that "Local Rule 151(b)" requires that the Court apply state law standards in deciding whether to impose a security requirement.  [Opposition to VL Motion 2 at 3-4.]  Apart from the bizarre reference to a purported Local Rule that does not exist in this District, this assertion plainly is wrong, as Local Rule 83-8.4 makes clear.  While the Court can do so, it certainly is not required to do so.

69

F.2d 859, 861 (2d Cir. 1965)).  In deciding whether to impose security under a local rule, the court may "take all the pertinent circumstances into account including the conduct of the litigants and the background and purpose of the litigation." *Leighton*, 340 F. at 861; *see also Aref v. Hickman*, 404 Fed. Appx. 205, 206 (9th Cir. Nov. 16, 2010) (affirming order to post security pursuant to Local Rule 83-8.2 issued against plaintiff found to be vexatious after district court found that he had consumed an unreasonable amount of court and defense resources by filing prolix and unnecessary documents, but remanding for explanation of how the $250,000 amount of the bond was determined).[39]

Accordingly, pursuant to this Court's inherent power and Local Rule 83-8.2, the Court recommends that, in order to secure the payment of any costs, sanctions, or other amounts which may be awarded against Plaintiffs, security in the amount of $2,000 should be ordered to be posted by Plaintiffs in each of these four cases, and that the failure to do so will result in the dismissal of any action in which such security has not been posted.  The Court has calculated this amount on an extremely conservative basis; it certainly is possible, even likely, that the actual costs and sanctions to be ordered may well exceed $2,000 in each of these cases and that a higher amount of security would be justified.[40]

***Second***, as described above, Plaintiffs have repeatedly stated their intent to file numerous other lawsuits.  Thirteen of the cases they have filed in this District to date had been dismissed for lack of merit, and based on the Court's review to date, it

---

[39]    Significantly, in the *Aref* action, the Central District thereafter reduced the security amount to $60,000 and dismissed the case after the plaintiff failed to pay it, and the Ninth Circuit dismissed the plaintiff's appeal therefrom as "so insubstantial as to not warrant further review." [*See* Case No. 5:06-cv-00023-VAP, Dkts. 450, 472, 476.]

[40]    The Court  notes that, as described earlier, in four of the LASC actions (nos. 10, 11, 19, and 20), awards of costs and fees were made in favor of the Defendants.  It is reasonable to anticipate that similar awards may ensue in the pending four cases, and thus, the above-noted upfront security posting requirement is appropriate and justified.

appears likely that the same fate could befall the four pending cases, although that decision has not yet been made.  The Court therefore also recommends that a pre-filing order issue as follows:  (1) the Clerk of the Court shall not file any civil complaint, habeas petition, or IFP application submitted by Plaintiffs unless Plaintiffs have filed a motion for leave to file such documents and a Judge of this District has granted leave for such filing(s); and (2) Plaintiffs must submit a copy of the Court's vexatious litigant order and a copy of the proposed filing (whether complaint, habeas petition, IFP application, or other civil case initiating document) with any motion seeking leave of Court to commence a new civil action.

*Third*, as noted earlier, Plaintiffs have been violating the Local Rules, and likely California Business and Professions Code § 6125, through Fairchild's ongoing delegation of her representation in these four cases to Hollywood and through Hollywood's ongoing provision and performance of legal services on her behalf.  This situation cannot continue.  Accordingly, the Court recommends that an order issue requiring:  Hollywood to cease performing legal services on Fairchild's behalf; and Fairchild to either obtain her own counsel in the four cases or submit proof to the Court, on an ongoing basis, competently and adequately establishing that Hollywood is not continuing to represent her.

## RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order:  (1) accepting this Report and Recommendation; (2) granting VL Motion I and VL Motion 2; (3) declaring Plaintiffs to be vexatious litigants; and (4) entering an Order in or similar to the form set forth above.

DATED:  September 17, 2019

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

71

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.